**T.L., Appellant–Petitioner,**

v.

**J.L., Appellee–Respondent.**

**No. 54A01–1008–DR–386.**

Court of Appeals of Indiana.

June 14, 2011.

Rehearing Denied Aug. 17, 2011.

Caroline B. Briggs, Lafayette, IN, Attorney for Appellant.

John S. Capper, IV, Capper Tulley & Reimondo, Crawfordsville, IN, Attorney for Appellee.

## OPINION

ROBB, Chief Judge.

### Case Summary and Issue

T.L. ("Mother") filed a notice of intent to relocate from Indiana to Tennessee with her two sons, ten-year-old J.B.L. and seven-year-old B.L. J.L. ("Father") objected and filed a motion to prevent relocation of the children, which the trial court granted following an evidentiary hearing. Mother appeals and raises three issues for our review, which we consolidate and restate as whether the trial court's judgment is clearly erroneous. Concluding that Mother has shown good faith and legitimate reasons for proposing the relocation, but the trial court did not clearly err in finding that relocation was not in the children's best interests, we affirm.

### Facts and Procedural History[1]

Mother and Father married in 1999 and two children, both boys, were born of the marriage: J.B.L. in May 2000 and B.L. in November 2003. In September 2008, Mother filed for dissolution, and a dissolution decree was entered in January 2009.

---

1. We heard oral argument on May 4, 2011, at our courtroom in Indianapolis, and thank counsel for their capable advocacy.

By agreement, Mother and Father were awarded joint legal custody of the children, with Mother having primary physical custody and Father exercising parenting time as agreed or, in the absence of agreement, according to the Indiana Parenting Time Guidelines. Father was to pay $275 per week in child support, an amount subsequently reduced by an agreed order to $212 per week. In addition, Mother was awarded the marital residence and accompanying mortgage with Mother to pay Father his share of the equity.

At all times during the marriage and since, Mother and Father have resided in Montgomery County, Indiana. Father is a lifelong resident of Montgomery County and has been an officer with the Crawfordsville Police Department for the past twenty-five years. Mother moved from Tullahoma, Tennessee, to Montgomery County in 1998 to work as a customer service manager for Fujicolor Processing. She planned to work in Montgomery County for one year to gain management experience and then return to Tennessee, but after meeting and marrying Father, she continued to work for Fujicolor until its Crawfordsville operations closed in 2008. Mother then took a job with Temple–Inland in Crawfordsville and remains employed there as a customer service representative, earning approximately $40,000 per year, which is $10,000 less than she earned at Fujicolor. Mother finds this job to be unfulfilling with no opportunity of advancement. While she has an associate's degree in psychology and bachelor's degree in business administration, she has not sought other employment in the Crawfordsville area.

Father lives 1.5 miles from Mother and the children and 7.5 miles from the children's school. He exercises overnight parenting time every other weekend, over some holidays, and for two weeks during the summer.[2] In addition, on weekdays Father is active in the boys' sporting activities, including baseball, basketball, football, and soccer. Father has purchased their sports equipment, coached their teams, and provides transportation to their practices and games. He also picks the boys up after school every weekday and supervises them until Mother returns from work.[3]

Father's parents, his two siblings, and their children all live in Montgomery County. Father's parents regularly attend the boys' sporting events and have the boys for some overnights at their home. Father's parents and siblings get together for major holidays throughout the year and cookouts during the summer, gatherings in which the boys and their cousins are included.

Mother's parents, her maternal grandmother, an aunt, two great-aunts, and several cousins reside in the Tullahoma, Tennessee area. The maternal grandmother has stage-three leukemia, early-stage dementia, and other health problems, and lives in an assisted living facility. As a result of the maternal grandmother's residence in a facility, the home where she formerly lived—a furnished, 2,500–square–foot home on 150 acres of farmland—is vacant but remains owned by Mother's family. It is to this residence near Shelbyville, Tennessee, approximately twenty miles from Tullahoma, that Mother wishes to relocate with the children.

2. Father testified that until just prior to the hearing in this case, he was unaware of his right under the Parenting Time Guidelines to have the children for approximately half of the summer, and that if his counsel in the dissolution had advised him of such, he would have taken that extended parenting time.

3. As a police officer, Father regularly works the night shift.

On January 25, 2010, Mother filed her notice of intent to relocate, to which Father filed an objection. Mother's stated reasons for the relocation were:

- As Mother is an only child and an only grandchild, and her mother works full-time, Mother "needs to be in Tennessee in order to spend time with her grandmother and help care for her" in her illness.

- "All of [Mother]'s family and support system is located in Tullahoma, Tennessee"; Father promised to take Mother back to Tennessee when Mother agreed to marry him; "[a]t this time, [Mother] has no one in Crawfordsville to help her with anything"; and the winters in Indiana are hard on Mother as she has no one to help clear snow from her driveway.

- Mother finds "no challenge or future in the job that she is now working" in Crawfordsville. She wishes to pursue a career as a registered nurse or nurse practitioner in order to have more "job stability and financial security." [4]

- Mother's parents have offered to pay for her nursing education in Tennessee but cannot pay for schooling in Indiana because they are already assisting Mother with her $1,349 mortgage payment on the Montgomery County residence. By moving to Tennessee, Mother could sell the Montgomery County residence and live rent-free in a home owned by her family.

- The home to which Mother would move the children has "unlimited access to fishing, raising animals, riding 4–wheelers, and playing outside," and the land has been in Mother's family for six generations. The children have told Mother they wish to move there,[5] and as the only grandchildren in the family, they would receive individual attention from Mother's family.[6]

Appendix at 14–16. Mother testified that if relocation of the children is denied, she will not relocate herself but will investigate other possible employment in the Montgomery County area.

Father's objection contended that it is not in the best interests of the children to move and that the move would end his ability to be significantly involved in the children's lives. Father requested, and the trial court granted, an injunction to prohibit Mother from relocating with the children until the merits of Mother's relocation were resolved.

On May 14, 2010, an evidentiary hearing was held at which Mother, Mother's parents, Father, and members of Father's family testified. The trial court took the matter under advisement and, on August 4, 2010, issued its findings of fact, conclusions of law, and judgment. The trial court's findings of fact that Mother does not challenge include:

6. ... [Mother] does not have employment, or the immediate prospect of employment, in Tennessee.

4. Mother's testimony identified two nursing schools in Tennessee that she might attend. She has not yet applied to either.

5. At the hearing, there was conflicting evidence regarding whether the children wish to move to Tennessee with Mother. Mother's mother testified that the children wish to move. Transcript at 86. Father testified that in November 2009 Mother took the children to Tennessee and told them they would be moving there. Father's sister, K.L., testified that J.B.L. told her "he did not want things to change, he wanted to be with both of his parents." Id. at 123.

6. Mother's parents testified they would be available to help Mother with the boys, for instance, by driving them to school in Tullahoma.

* * *

8. Since the marriage was dissolved, [Father] has had exceptionally frequent contact with the boys. Immediately after the divorce, he saw them daily at [Mother]'s residence in the morning and assisted them in getting ready for school. He also picks them up after school and is with them until [Mother] is home from work. The daily morning contact was ended by [Mother] in the fall of 2009 when [Father] began dating [D.H.], with whom he still maintains a relationship.

* * *

10. If [Mother] moves with the children, she proposes that [Father] would have them one-half the time they are not in school (Tullahoma has a "non-traditional" school calendar with an eight-week summer break and two-week spring and fall breaks), alternate Thanksgiving and Christmas holidays, and a weekend every six weeks with the parties meeting halfway to exchange the children.

* * *

12. Both children have good relationships with each parent, and with their extended families. Both are good students and enjoy good health. . . .

13. . . . Tullahoma is six hours away by automobile, or a 12–hour round trip from Crawfordsville. Relocation would end [Father]'s frequent contact with the boys and exclude him from his involvement in their school, extracurricular and every-day activities, as well as the regular and frequent involvement of his family.

*Id.* at 21–23. The trial court concluded that "[Mother] has failed to meet her burden of proof that the proposed relocation is for a legitimate reason and in good faith. Further, although the burden of proof therefore does not shift to [Father], he has clearly shown that the move would not be in the best interests of the children." *Id.* at 26.

The trial court ordered that Mother shall not relocate with the children and the parties shall continue to have joint legal custody with Mother having primary physical custody. Mother now appeals. Additional facts will be supplied as appropriate.

*Discussion and Decision*

I. Standard of Review

The trial court entered findings of fact and conclusions of law pursuant to Father's request under Indiana Trial Rule 52(A). Our standard of review is well-settled:

> [W]e must first determine whether the record supports the factual findings, and then whether the findings support the judgment. On appeal, we will not set aside the findings or judgment unless they are clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses. We therefore consider only the evidence favorable to the judgment and the reasonable inferences flowing therefrom, and we will neither reweigh the evidence nor assess witness credibility. A judgment is clearly erroneous when there is no evidence to support the findings, the findings do not support the judgment, or the trial court applies the wrong legal standard to properly found facts.

*M.S. v. C.S.*, 938 N.E.2d 278, 281–82 (Ind. Ct.App.2010) (quotations and citations omitted). We may affirm the trial court on any legal theory supported by the factual findings even if the trial court used a different legal theory. *Mitchell v. Mitchell*, 695 N.E.2d 920, 923 (Ind.1998). Before affirming on a legal theory supported by the findings but not espoused by the trial court, we should be confident that our

affirmance is consistent with all of the trial court's factual findings and inferences reasonably drawn therefrom. *Id.* at 924.

"In addition to the standard of review under Trial Rule 52, our supreme court has expressed a 'preference for granting latitude and deference to our trial judges in family law matters.'" *In re Paternity of Ba.S.,* 911 N.E.2d 1252, 1254 (Ind.Ct. App.2009) (quoting *In re Marriage of Richardson,* 622 N.E.2d 178, 178 (Ind. 1993)). Our supreme court has recently re-emphasized this principle, stating that we afford such deference because of trial judges' "unique, direct interactions with the parties face-to-face." *Best v. Best,* 941 N.E.2d 499, 502 (Ind.2011). "Thus enabled to assess credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children." *Id.; see also Kirk v. Kirk,* 770 N.E.2d 304, 307 (Ind.2002). Therefore, we "will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment. The concern for finality in custody matters reinforces this doctrine." *Baxendale v. Raich,* 878 N.E.2d 1252, 1257–58 (Ind.2008).

## II. Denial of Relocation

### A. Legal Standard

■ Under the relocation statutes enacted in 2006, a relocating parent must file a notice of intent to relocate and send a copy of the notice to any nonrelocating parent. Ind.Code § 31–17–2.2–1(a). A nonrelocating parent may object to relocation in either of two ways: by filing a motion to modify the custody order or by filing, within sixty days of receipt of the notice, a motion to prevent relocation of the child. *Baxendale,* 878 N.E.2d at 1256 n. 5; *see* Ind.Code § 31–17–2.2–5(a) (re-

garding motion to prevent relocation). Upon request of either party, the trial court shall hold a full evidentiary hearing to grant or deny a motion to prevent relocation of the child. Ind.Code § 31–17–2.2–5(b). "The relocating individual has the burden of proof that the proposed relocation is made in good faith and for a legitimate reason." Ind.Code § 31–17–2.2–5(c). If the relocating parent meets that burden, "the burden shifts to the nonrelocating parent to show that the proposed relocation is not in the best interest of the child." Ind.Code § 31–17–2.2–5(d).

■ In considering the proposed relocation, the trial court shall take into account the following factors:

(1) The distance involved in the proposed change of residence.

(2) The hardship and expense involved for the nonrelocating individual to exercise parenting time. . . .

(3) The feasibility of preserving the relationship between the nonrelocating individual and the child through suitable parenting time . . . including consideration of the financial circumstances of the parties.

(4) Whether there is an established pattern of conduct by the relocating individual, including actions by the relocating individual to either promote or thwart a nonrelocating individual's contact with the child.

(5) The reasons provided by the:

(A) relocating individual for seeking relocation; and

(B) nonrelocating parent for opposing the relocation of the child.

(6) Other factors affecting the best interest of the child.

Ind.Code § 31–17–2.2–1(b); *see Swadner v. Swadner,* 897 N.E.2d 966, 976 (Ind.Ct. App.2008) (applying these factors to con-

sideration of a motion to prevent reloca-tion). The "[o]ther factors affecting the best interest of the child" include, by im-plication, the factors set forth for custody determinations and modifications under Indiana Code section 31–17–2–8. *Baxen-dale*, 878 N.E.2d at 1257.

### B.   Trial Court's Findings of Fact

Mother argues that certain of the trial court's findings of fact are clearly errone-ous, specifically challenging findings 7, 9, and 11 and conclusion of law 3, which Mother states contains an erroneous find-ing of fact. Mother also argues each of these alleged errors affects the judgment against Mother.

Finding number 7 states:

[Mother] wishes to have more geograph-ic separation from [Father]. She testi-fied extensively as to [Father]'s behavior toward her, ranging from mood swings, anger over child support, and unwanted telephone calls and text messages. [Fa-ther] testified to similar behaviors on the part of [Mother], most of which in-volved strained communications and hos-tility after he began a new romantic relationship.

App. at 22. We agree with Mother that the trial court's inference Mother wishes to relocate in order to have "more geo-graphic separation from [Father]" is clear-ly erroneous. While the trial court fairly characterizes Mother's and Father's re-spective testimonies regarding their strained relationship, there is no direct evidence that Mother's proposed relocation is for the purpose of geographic separation from Father, and such an inference does not reasonably follow from the evidence as a whole. Rather, Mother testified, and it was not controverted, that she is not seek-ing relocation in order to remove the chil-dren from Father and she believes it is

important that they maintain a relation-ship with Father. Tr. at 29.

Finding number 9 states that Fa-ther "exercises parenting time every other weekend, midweek and holidays." App. at 22. Mother contends Father does not ex-ercise mid-week parenting time. Howev-er, Mother in her testimony acknowledged Father spends about an hour with the boys each weekday after school until Mother is home from work, in addition to Father's involvement in the boys' sports practices and games. It was not clearly erroneous for the trial court to characterize Father's consistent weekday time with the boys as parenting time.

Finding number 11 states that Father's parents and extended family all

have a close and supportive relationship with the children. The paternal grand-parents are both retired and they see the boys at least once a week and attend almost all of their sporting events. At [Mother]'s request, [Father]'s mother took [B.L.] to summer speech therapy sessions. [Mother] has not asked her to help with the children at other times, although she is willing to help. The paternal grandparents attend school functions and programs. The entire family participates in holiday gatherings and weekend cookouts.

*Id.* at 23. Mother argues that this finding is incorrect because the paternal grand-mother is not retired and is incomplete because the trial court omitted undisputed evidence that gambling occurs at Father's family's cookouts.

Mother is correct that the paternal grandmother, C.L., is employed. Howev-er, Mother does not explain how this fact affects the judgment; C.L. testified that she has a flexible work schedule and sees Father and his children at least once per week. She also testified that she and the children's paternal grandfather attend al-

most all of J.B.L.'s ballgames and have attended the school Christmas program every year. C.L. also testified that she took B.L. to speech therapy every day for two weeks in the summer of 2009 and did so at Mother's request made when Mother saw C.L. at a baseball tournament. C.L. further testified that she and the paternal grandfather are willing and able to help with the children in other ways, such as if the children are sick or school is cancelled because of snow, but Mother has never called or asked for help at other times since the divorce was finalized. In addition, C.L. has had the children overnight at her house "probably once every couple of months." Tr. at 102. The trial court's finding, as far as it affects the judgment, is thus supported by the record.

As for the gambling that occurs at the family cookouts, C.L. testified it consists of playing "Texas Holdem Poker" for money and that the children, while present, do not participate. *Id.* at 113. Father's sister, K.L., testified that the family gatherings sometimes involve euchre tournaments. Even if the trial court had included these facts in its findings, they would not have affected the judgment and as such are irrelevant to our review.

The trial court's conclusion of law number 3 states:

> The proposed move to a residence six hours away is significant, as such distance would have a substantial adverse impact on the children's relationships, not only with their father, but with other close relatives on the father's side of the family, and with their friends, neighbors and schoolmates. Daily contact with [Father] would be replaced by intermittent contact consisting primarily of one-week at a time visits or other visits at times the children were not in school, or weekend visits less than once a month during school periods. This would

change not only the quantity and frequency of [Father]'s time with his children, but would also change the nature of his time he has always spent with them. Both boys, and especially [J.B.L.], are involved with sports, and [Father] has been the parent who has primarily encouraged and participated in their athletic activities, which have also regularly involved his extended family. The distance would create a hardship for [Father] to continue to be highly involved in the boys' activities, or to even attend such, if they were allowed to continue to participate in sports . . . .

App. at 24–25. Mother argues that while it is undisputed both children are involved in sports, there is no evidence they have formed substantial friendships beyond having athletic teammates. Mother also questions whether the distance involved in relocation to Tennessee and the hardship to Father have any significance beyond his involvement in the children's sports, as "the evidence presented [is] that [Father's] involvement is nothing but athletics, only taking his children to church six times, scheduling basketball practices on days when parent-teacher conferences were scheduled, and choosing Las Vegas over visitation with his children." Brief of Appellant at 19.

The trial court's reasoning is supported by the record, and Mother does not fairly represent the record in this regard. Mother and Father both testified that the boys have friends in the local community. Mother acknowledged that Father regularly exercises daily after-school care and overnight parenting time every other weekend. Father testified that at his home, he has sit-down, family meals with the boys. Father's parental involvement has also included the following: attending "[a] couple" parent-teacher conferences since the divorce, tr. at 198; going on

school field trips; "sometimes" taking J.B.L. fishing with Father and Father's brother, *id.* at 53; taking the boys to church about six times per year; taking J.B.L. to football and basketball camps each summer; going with the boys to the Children's Museum and the State Fair; taking the boys swimming; and traveling with the boys to professional sports games and to Santa Claus, Indiana, for a three- or four-day vacation, *id.* at 215. Father testified he has tried to attend the boys' medical appointments on several occasions, but Mother told him that she did not want him there and on at least one occasion threatened to call the police. *Id.* at 172.

Mother points to particular flaws in Father's parenting, such as missing a parent-teacher conference to coach basketball practice and traveling to Las Vegas on one weekend when he was originally scheduled for overnight visitation with the children. However, Father testified Mother scheduled that parent-teacher conference for a day when she knew he had already scheduled basketball practice, and that he made a prior agreement with Mother to switch weekends of visitation so that he would be free to go to Las Vegas for the wedding of a fellow police officer.

In sum, the trial court in its findings clearly erred as to Mother's reasons for seeking to relocate but committed no other error that affects the judgment. With the above in mind, and accordingly setting aside the findings we have found to be clearly erroneous, we turn to the trial court's conclusions of law and judgment.

### C. Trial Court's Conclusions of Law and Judgment

Mother argues the trial court's remaining findings of fact fail to support its conclusions of law and judgment that: 1) Mother did not meet her burden of proving good faith and legitimate reasons to move; and 2) even if she did, Father

proved the relocation was not in the children's best interests.

#### 1. Reasons for Relocation

The trial court, in its finding number 6, largely accepted as true Mother's stated reasons for the relocation. These included having closer proximity to her parents and grandmother in Tennessee, her desire to both benefit from greater family support and provide help for her ill grandmother, the prospect of a reduced financial burden from living rent-free in a house owned by her family, and the resulting opportunity for a new career with education paid for by her family. We agree with Mother that these reasons for the relocation do not support the trial court's conclusion that the relocation was not proposed in good faith and for a legitimate reason.

Rather, we conclude that Mother's reasons for the proposed relocation are legitimate and in good faith. The trial court, in concluding to the contrary, cited evidence of Mother's acrimonious relationship with Father and inferred Mother's personal desire to live near her parents and farther away from Father. As we have explained above, such a finding is not a reasonable inference from the evidence. Even if it were, Indiana Code section 31–17–2.2–5 does not by its terms require that desire for distance from a former spouse form no part of the subjective motivation for relocation. Rather, the statute requires that a legitimate reason be objectively shown, and by requiring that the relocation be in good faith, demands that the objective reason be more than a mere pretext.

Because our case law has not set forth explicitly the meaning of legitimate and good faith reasons in the relocation context, we make two additional observations. First, it is common in our society that people move to live near family members,

for financial reasons, or to obtain or maintain employment. We infer that these and similar reasons—such as Mother gave and the trial court largely accepted—are what the legislature intended in requiring that relocation be for "legitimate" and "good faith" reasons. *See Baxendale,* 878 N.E.2d at 1254, 1256 n. 5 (stating that relocation of child was proposed in good faith by parent who, after a one-year job search, moved from Indiana to Minnesota to accept an employment offer); *In re Paternity of X.A.S.,* 928 N.E.2d 222 (Ind. Ct.App.2010) (holding that trial court erred in denying request to relocate filed by parent whose spouse's service in the Navy required move to California), *trans. denied; Swadner,* 897 N.E.2d at 976 (concluding that mother's proposed relocation was in good faith and for a legitimate reason when mother planned to relocate to reside with her parents, who could provide child care while she worked, and mother "intended to reside with her parents until she had paid off all of her debts"); *Rogers v. Rogers,* 876 N.E.2d 1121, 1130 (Ind.Ct. App.2007) (concluding that relocation to Texas was in good faith and for a legitimate reason when it would bring the children into closer proximity to mother's family and would allow mother to obtain better-paying employment), *trans. denied.*

Second, as the relocation statute provides and our supreme court has observed, the resolution of relocation disputes ultimately turns on a judicial determination of the best interests of the child, part two of the two-prong standard. *Baxendale,* 878 N.E.2d at 1256 n. 5. If part one, the requirement of a legitimate and good faith reason, posed an inordinately high bar for a relocating parent to meet, it could too often prevent trial courts from reaching part two and appropriately deciding the dispute based on the best interests of the affected child.

In sum, in light of its findings that Mother proposed relocation in order to live closer to her parents, to reduce her living expenses, and to obtain education for a new career, the trial court erred in its conclusion that Mother's proposed relocation was not in good faith and for a legitimate reason. However, our inquiry does not end there, because the trial court also determined that relocation was not in the children's best interests, a determination we now examine.

### 2. Children's Best Interests

■ Initially we note the parties invite us to take divergent approaches in applying the standard of review. Mother states that the trial court's determination that Father proved relocation was not in the children's best interests is a conclusion of law we should review de novo. Br. of Appellant at 25. Father by contrast frames the best interests issue as whether the trial court's determination is supported by the evidence, characterizing our review as looking only to whether the trial court committed clear error. *See* Brief of the Appellee at 11. Father's characterization better accords with our precedent, as exemplified by this court's reasoning in *Swadner:*

> [The] evidence supports the trial court's determination that relocation was not in the children's best interests and we cannot conclude that the trial court abused its discretion in denying Mother's petition to relocate. While we acknowledge that Mother presented evidence that would also support the conclusion that relocation was in the children's best interests, we will not reweigh the conflicting evidence and cannot say that the trial court erred in reaching the conclusion that it did.

897 N.E.2d at 977. As such, our review of the best interests determination requires us to view the evidence in a light most

favorable to the trial court's decision and defer to the trial court's weighing of the evidence. *See Best*, 941 N.E.2d at 502.

The trial court received evidence on a number of the factors set forth in Indiana Code section 31–17–2.2–1(b) as relevant to a child's best interests in the context of relocation. We will examine the evidence presented on each relevant factor in turn.

a. The Distance Involved. The distance between Montgomery County and the Tullahoma area is considerable, amounting to a six-hour drive each way. While this factor cannot be determinative in and of itself, because the statute as written implies even a long-distance relocation can be in the best interests of a child, the distance does bear on the trial court's consideration of the other factors.

b. The "feasibility of preserving the relationship between the nonrelocating individual and the child through suitable parenting time...." Ind.Code § 31–17–2.2–1(b)(3). The trial court received evidence that Father has a "very supportive" relationship with the boys and that the boys are "probably the highest priority that [Father has] got." Tr. at 116; *accord id.* at 118–19, 137. While if the relocation were approved, Mother would allow Father somewhat more overnights than he has previously exercised, Father would still be deprived of seeing the boys daily after school and coaching them in their sports, as he has consistently done. Rather, Mother would be the only parent exercising time with the children on a daily or weekly basis while school is in session.[7] The evidence therefore supports the trial court's finding that relocation would have a significant adverse effect on Father's strong and supportive relationship with the children. We do observe, however, that

this fact alone cannot be determinative because of how the relocation statute is written: if a relocation that deprives one parent of daily or weekly time with a child could never be in the child's best interests, then the statute would never allow for a long-distance move when the nonrelocating parent has exercised such parenting time, as it plainly does in the proper circumstances.

c. Pattern of Conduct by Relocating Parent. As for the existence of a pattern of conduct by Mother, including actions to promote or thwart Father's contact with the children, there is evidence that Mother has unilaterally set limits on Father's relationship with the children. As the trial court found, Mother ended Father's daily morning time with the boys when he began seeing his current girlfriend, and since the same time has prevented what was formerly his daily telephone contact with them. Tr. at 140, 149–51. This factor is relevant to the trial court's best interests determination because it supports the trial court's inference that the high level of cooperation required on the part of parents, who live a long distance apart, in order for both to maintain strong relationships with their children may be absent from this case. *See* App. at 25 (trial court stating that the strained relationship between Mother and Father would have adverse consequences for Father's involvement in the children's lives if the relocation were approved).

d. Reasons for Seeking or Opposing Relocation. Father testified that he believes relocation would not be in the children's best interests and would compromise his relationship with them. Thus the evidence favorable to the trial court's judgment suggests that Father, like Mother,

---

**7.** As noted above, Mother indicated that if the relocation were approved, Father would have the children for overnight visitation during half of the time that their school is not in session and for one weekend every six weeks during the school year.

has good faith and legitimate reasons for his position in this matter.

e. Other Factors. In addition to the factors listed in section 31–17–2.2–1(b), the trial court received evidence relating to the financial impact of relocation on Mother and the children, the children's relationships with Mother, Father, and extended family on both sides, and the children's adjustment to school and community. Mother testified that relocation will improve her financial situation and by implication the children's, which may or may not be the case because Mother lacks immediate prospects of employment in the Tullahoma area. Rather, she counts on being able to sell her Montgomery County home for the balance of her outstanding mortgage obligation, that her parents will pay for and she will successfully complete nursing school, and that she will become gainfully employed in the nursing field— all of which may take several years especially because Mother has not yet applied to nursing school. Thus, the trial court did not clearly err by not finding that relocation would significantly improve Mother's or the children's financial situation.

The trial court also received evidence that the boys are doing well academically in school, are physically and mentally healthy, have activities and friends that they enjoy, and all in all are well adjusted to their Montgomery County community. E.g., tr. at 105–106, 120. Father's mother and siblings testified that the boys enjoy a close and supportive relationship with them in Montgomery County. The trial court reasonably found that those relationships would suffer if the relocation was approved because Father's parents would no longer be able to see the boys weekly or regularly attend their sporting events and school activities. Nor would the boys be able to attend as many holiday and summer gatherings with Father's entire family. While the children have visited the Tullahoma area and also have a good relationship with Mother's family, Father's mother, C.L., testified that the relocation would be "very devastating, very disruptive" to the children. Id. at 108. C.L. also testified that while B.L. makes friends easily, J.B.L. "is a little bit more held back." Id. at 112; accord id. at 117. The disruption to the children's stability required for them to develop relationships in a new school and community justifies the trial court's finding that the relocation would have a "substantial adverse impact" on their relationships with friends, neighbors, and schoolmates. App. at 24; cf. Baxendale, 878 N.E.2d at 1257 (stating that "[f]or an older child who has formed friendships, attends school, and participates in activities or sports, is involved in church, or enjoys the security of supportive relationships with nearby relatives or others in his community, a move out of state may have a much more significant effect" than for a younger child (quotation omitted)). In addition, the trial court received evidence that J.B.L. preferred to live near both of his parents and did not want a change from the present arrangement. Tr. at 123. Thus, the trial court did not clearly err by not finding that the children's wishes favored relocation.

Applying our standard of review, the issue is not whether we would have made the same decision that the trial court did, but whether the trial court's findings that are supported by the evidence—disregarding those few that were unsupported—are sufficient to sustain its decision. Based upon our review of the record, we must answer this question affirmatively. We find this case akin to Browell v. Bagby, 875 N.E.2d 410 (Ind.Ct.App.2007), trans. denied, where this court concluded under the predecessor to the present relocation statute that the evidence supported the trial

court's conclusion that relocation with the mother to Tennessee was not in the children's best interests. We affirmed the trial court's reliance on evidence that both parents enjoyed loving relationships with the children, the children had close relationships with their extended family in Indiana, the older child had established ties to school and community in Indiana, and the potential for separation from their longtime environment caused the children anxiety. *Id.* at 415–16.

In support of her argument, Mother cites this court's decisions in *Paternity of X.A.S.* and *Rogers.* In *X.A.S.*, this court reversed a trial court order that both denied the custodial father's request to relocate to California with his son and awarded custody to the mother. We concluded the record "d[id] not contain sufficient evidence to support a change from the status quo" and as a result "the boy should remain with his father." 928 N.E.2d at 223. Insofar as *X.A.S.* reversed a modification of custody, its reasoning is inapplicable to the present case where the trial court ordered the parties to maintain the status quo of Mother residing in Montgomery County and continuing to have primary physical custody of the children. Further, in *X.A.S.* the parents had a "cordial" relationship for nine years following the award of custody to the father, there was no evidence of a pattern to thwart the mother's relationship with the child, and thus we found every indication that with suitable parenting time, the son could preserve his relationship with the mother despite the distance involved in the relocation. *Id.* at 223, 226–27. In addition, the son, who was twelve, expressed a wish to move to California with his father. *Id.* at 229. Here, due to Mother's and Father's strained relationship, the facts are not so favorable to Father's ability to continue the present quality of his relationship with the boys if the relocation is approved, and the evidence is disputed that the boys wish to move to Tennessee with Mother.

In *Rogers,* this court upheld a trial court's grant of the mother's request to relocate to Texas with her two daughters. The mother had specific plans for immediate employment in Texas, where she would most likely earn considerably more than she had earned in Indiana, and the children would have more family ties in Texas than they had in Indiana. 876 N.E.2d at 1125, 1130. The children's therapist, a teacher, and a school counselor offered their opinions that the move would not undermine the children's stability or otherwise negatively affect them. Noting that our standard of review does not permit us to reweigh the evidence, we affirmed the trial court's finding that the father failed to prove relocation was not in the children's best interests. *Id.* at 1132. Here, while *Rogers* leads us to believe that other reasonable conclusions than that reached by the trial court in the present case were possible, *Rogers* does not persuade us that the trial court's conclusion was unreasonable or unsupported by the evidence.

### Conclusion

We conclude that Mother's proposed relocation of the children to Tennessee was in good faith and for legitimate reasons. However, the evidence supports the trial court's conclusion that relocation was not in the children's best interests. As a result, the trial court's grant of Father's motion to prevent relocation of the children is not clearly erroneous, and we therefore affirm the trial court's judgment.

Affirmed.

RILEY, J., and BRADFORD, J., concur.