## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Caryn E. Garton
Leonard, Hammond, Thoma & Terrill
Fort Wayne, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Paternity of Y.S.G., David M. Grimes, *Appellant-Petitioner,* v. Brooklynn A. Ross, *Appellee-Respondent.* | July 31, 2018 Court of Appeals Case No. 18A-JP-161 Appeal from the LaPorte Superior Court The Honorable Richard R. Stalbrink, Jr., Judge Trial Court Cause No. 46D02-1708-JP-209 |

**Kirsch, Judge.**

[1] David M. Grimes ("Father") appeals the trial court's order establishing his paternity of Y.S.G. ("Child"), granting sole physical and legal custody of Child to Brooklynn A. Ross ("Mother"), and permitting Mother to relocate to

Arizona with Child. Father raises several issues on appeal that we consolidate and restate as:

I. Whether the trial court erred when it found that Mother's relocation to Arizona was made in good faith and for legitimate purposes and that it was in the best interest of Child to relocate with Mother; and

II. Whether the trial court erred when it granted sole legal custody of Child to Mother.

[2] We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[3] During the fall of 2012, Father and Mother met and began dating. For about two years, the parties were in a committed relationship. Shortly after they broke up in 2014, Mother moved to Indianapolis and learned she was pregnant. Mother then moved back to South Bend with Father. Father works for Notre Dame University as an assistant strength coach for the football team, makes approximately $60,000 per year, and has worked there for seven years. *Tr.* at 9-10, 31. When Mother moved back to South Bend, she and Father rented a home together and later moved into an apartment five minutes from Notre Dame where they lived together until Child was born in 2015. After Child's birth, the parties decided to move forward as a family and purchased a home with three bedrooms and two bathrooms that was close to Notre Dame's campus. Father was very active in Child's life and participated in many

activities including changing diapers, reading to Child, and providing financially for her.

[4] Around June of 2016, the parties separated, and Mother moved back in with her mother, Roslyn Sutton ("Sutton"), in Michigan City, Indiana. Despite the distance, Father attempted to see Child as much as possible and would drive to Michigan City after football games on Saturday and keep her with him overnight until Sunday. *Id*. at 15. Father made sure that he had all of Child's necessities at his home for when she visited, including food, clothing, toys, and books. *Id*. at 19. Father also made efforts to drive to Michigan City during the week to take Child to the park or sometimes dinner. *Id*. at 15. In January of 2018, Father added Child to his insurance policy. Due to Mother's move and multiple jobs, many of her family members began to help out, including Sutton, who was a significant part of Child's support system. *Id*. at 16-17, 83, 113.

[5] In August 2017, Mother sent a text message to Father and informed him that she was going to take a job in Arizona, working as a real estate agent and subsequently relocated by herself to Arizona on August 13, 2017. *Id*. at 20. Father was opposed to the move. *Id*. at 20, 22. Around September 4, 2017, Mother took Child to Arizona. Although Mother notified Father of her intent to move to Arizona, she did not file notice through the court of her intent to relocate. Once in Arizona, Father continued to have contact with Child on the phone and through FaceTime. *Id*. at 23.

[6] When Mother was living in South Bend, she was employed as a real estate agent at Cressy & Everett. In Arizona, she was employed as a member of an expansion team with Jack Bataoel Real Estate. *Id.* at 59. Mother said that the new position in Arizona was a significant pay increase. *Id.* at 59-60. Mother stated that her contract with Jack Bataoel Real Estate provided that if she did not make at least $100,000 in the first year, her employer would make up the difference; however, the employment contract she provided to the court did not contain such a promise. *Id.* at 59, 131.

[7] In Mother's new employment, she was an independent contractor and would need to spend at least six hours a day in the office doing work-related activities. *Id.* at 64. During that time, Child would be put in a bilingual daycare located close to Mother's office. *Id.* At the time of the hearing in this case, Mother testified that she was a licensed realtor in Arizona, but was not currently receiving any salary and that she did not have any houses on the market in Arizona. *Id.* at 117-18. She said that she had one pending sale and one active listing in Indiana. *Id.* at 127. At the time of the hearing, Mother was living in Gilbert, Arizona, a suburb of Phoenix, and, during her time of transition, was staying in the vacation home of her previous Indiana employer. Until she could start making an income, Mother utilized the money she had saved up from her Indiana closings to pay for the move, as well as a generous gift from a friend. *Id.* at 60, 132.

[8] On August 14, 2017, Father filed with the trial court a petition to establish paternity with an attached paternity affidavit signed by both parents. On

September 6, 2017, Father filed an emergency petition and objection to Mother's relocation. Later in September, Mother, who was traveling to and from Arizona frequently because of the court hearings, returned from Arizona to Indiana with Child and allowed Father to have temporary custody of Child for approximately three weeks. Father sought accommodation from his work and also enrolled Child in a bilingual daycare. *Id.* at 23-24. During the three weeks Father had Child, he arranged for daily contact between Mother and Child at 7:00 p.m. via telephone, FaceTime, or Skype. *Id.* at 51-52. Father would also allow Mother to contact Child other times depending on the circumstances. *Id.* at 52.

[9]     A hearing on Father's petition was held on October 10, and 26, 2017. At the hearing, Father testified as to his normal work schedule, which did not include August, when Father is at football camp, nor did it include spring break and the whole month of May, when Father is completely off work and has time to spend with Child. Father testified that on Mondays he would drop Child off at daycare around 12:00 p.m. and then go to work until about 5:30 p.m. and pick up Child. *Id.* at 27. Tuesday through Thursday, Father would take Child to daycare from about 7:30 a.m. until 9:30 a.m., and then he would go pick her up and spend time with her until he would have to go back to work from 12:30 p.m. until 5:30 p.m., when he would go pick Child up from daycare. *Id.* at 28. Father testified that on Fridays he would drop Child off at daycare at about 6:00 a.m. and pick her up at about 7:30 a.m. and then be able to spend the rest of the day with her either at home or at work. *Id.* at 28.

[10]     Father informed the court that many university staff members help with the care of Child and that many other football coaches have children, many of whom spend time at the athletic facility while their parents work. *Id*. at 27. Father also testified that if he had to go out of town for the weekend he would reach out to Sutton in Michigan City to care for Child until he could get home. *Id*. at 25, 28. Father said that although he had contemplated changing jobs in the past, he did not foresee moving from Notre Dame at this time and that his current job had room for financial growth. *Id*. at 38-39. Father additionally stated that he would not move or take other employment if it meant moving away from his daughter. *Id*. at 39.

[11]     During the hearing, there was testimony given in regard to health, education and religion of Child. As to education, Father testified that he would prefer to homeschool Child, but after acknowledging that Child was only two years old, he stated that there was a nearby Montessori school that Child could attend. *Id*. at 49. Mother testified that for education, she would prefer Child to be in an atmosphere with low student-to-teacher ratios and a structured setting such as, "homeschooling where it's multiple children or a small private school." *Id*. at 99-100. However, she did not think that a Montessori school would be a good fit for Child. *Id*. at 99. As for religion, Mother testified that, in general, she and Father shared religious beliefs, but that Father leaned more toward the stricter side of religion and a stricter interpretation of the Bible. *Id*. at 103-04. In regard to discipline, Father stated that he believed in physical discipline in an appropriate setting, including spankings, slaps on the hands, and using a belt.

*Id*. at 51.  Mother testified that "[a]s a whole," she and Father agreed on discipline techniques, but that sometimes Father's disciplining of Child was "completely inappropriate," such as pinching, loudly yelling at Child and spanking with a belt numerous times.  *Id*. at 92.  Mother recounted a time where Father spanked Child multiple times with a belt that made Mother afraid.  *Id*. at 93.  In reference to medical needs, Mother stated that she and Father disagree on some health issues, such as vaccines, and she expressed concern that there might be circumstances where she and Father could not agree on medical decisions.  *Id*. at 102-03.  Father testified that, prior to the hearing, he and Mother had been able to communicate and work out all their parenting issues.  *Id*. at 55.  He also testified that he believed that he and Mother could work together and share legal custody.  *Id*. at 50.

[12]     Mother did testify that she was comfortable with Father's parenting abilities and agreed that he was a good dad to Child.  *Id*. at 113.  Father also agreed that Mother was a good parent and needed to be a part of Child's life.  *Id*. at 29.  He also stated that it was his belief that it was in Child's best interest to remain in Indiana where she could "cultivate a relationship with both her parents."  *Id*. On January 10, 2018, the trial court issued an order establishing paternity, granting sole legal and physical custody to Mother, and granting Mother's request to relocate.  Father now appeals.

# Discussion and Decision

[13] Mother has not filed an appellee's brief. When an appellee fails to submit a brief on appeal, we apply a less stringent standard of review with respect to the showing necessary to establish reversible error. *In re Paternity of S.C.*, 966 N.E.2d 143, 148 (Ind. Ct. App. 2012), *trans. denied.* We may reverse if the appellant establishes prima facie error, which is an error at first sight, on first appearance, or on the face of it. *Id.* "Moreover, we will not undertake the burden of developing legal arguments on the appellee's behalf." *Id.* Nevertheless, even under this less stringent standard, we are obligated to correctly apply the law to the facts in the record to determine whether reversal is warranted. *Tisdale v. Bolick*, 978 N.E.2d 30, 34 (Ind. Ct. App. 2012).

[14] Where, as here, the trial court entered findings of fact and conclusions thereon, we must first determine whether the record supports the factual findings, and then whether the findings support the judgment. *M.S. v. C.S.*, 938 N.E.2d 278, 281 (Ind. Ct. App. 2010). On appeal, we will not set aside the findings or judgment unless they are clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses. *Id.* at 281-82. We consider only the evidence favorable to the judgment and the reasonable inferences flowing therefrom, and we will neither reweigh the evidence nor assess witness credibility. *Id.* at 282. A judgment is clearly erroneous when there is no evidence to support the findings, the findings do not support the judgment, or the trial court applies the wrong legal standard to properly found facts. *Id.*

[15] "[O]ur [S]upreme [C]ourt has expressed a 'preference for granting latitude and deference to our trial judges in family law matters.'" *T.L. v. J.L.*, 950 N.E.2d 779, 784 (Ind. Ct. App. 2011) (quoting *In re Paternity of Ba.S.*, 911 N.E.2d 1252, 1254 (Ind. Ct. App. 2009)). We afford such deference because of trial judges' "unique, direct interactions with the parties face-to-face." *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011). "Our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children" due to their ability "to assess credibility and character through both factual testimony and intuitive discernment." *Id.* Thus, we "will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment. The concern for finality in custody matters reinforces this doctrine." *Baxendale v. Raich*, 878 N.E.2d 1252, 1257-58 (Ind. 2008).

## I.    Relocation

[16] Father argues that the trial court erred in determining that Mother's relocation to Arizona was made in good faith and for legitimate purposes and that it was in the best interest of Child to relocate with Mother. Under the relocation statutes, a relocating parent must file a notice of intent to relocate and send a copy of the notice to any nonrelocating parent. Ind. Code § 31-17-2.2-1(a). If a nonrelocating parent objects to the relocation of the child, the parent must, not later than sixty days after the receipt of notice from the relocating parent, file a motion in opposition to the motion to relocate. Ind. Code § 31-17-2.2-5(a). Once a nonrelocating parent has filed a motion in opposition to the relocation

of the child, "[o]n the request of either party, the court shall hold a full evidentiary hearing to grant or deny a relocation motion [.]" Ind. Code § 31-17-2.2-5(b). During this hearing, "[t]he relocating individual has the burden of proof that the proposed relocation is made in good faith and for a legitimate reason." Ind. Code § 31-17-2.2-5(c). "If the relocating individual meets the burden of proof under subsection (c), the burden shifts to the nonrelocating parent to show that the proposed relocation is not in the best interest of the child." Ind. Code § 31-17-2.2-5(d).

[17] In considering the proposed relocation, the trial court shall take into account the following factors:

(1) The distance involved in the proposed change of residence.

(2) The hardship and expense involved for the nonrelocating individual to exercise parenting time or grandparent visitation.

(3) The feasibility of preserving the relationship between the nonrelocating individual and the child through suitable parenting time and grandparent visitation arrangements, including consideration of the financial circumstances of the parties.

(4) Whether there is an established pattern of conduct by the relocating individual, including actions by the relocating individual to either promote or thwart a nonrelocating individual's contact with the child.

(5) The reasons provided by the:

(A) relocating individual for seeking relocation; and

(B) nonrelocating parent for opposing the relocation of the child.

(6) Other factors affecting the best interest of the child.

Ind. Code § 31-17-2.2-1(b). The "[o]ther factors affecting the best interest of the child" include the statutory factors relevant to an initial custody order or modification thereof, such as the child's age and sex; the parents' wishes; the child's wishes; the child's relationship with parents, siblings, and other persons affecting the child's best interests; and the child's adjustment to home, school, and the community. Ind. Code § 31-17-2-8.

[18] In challenging the trial court's order allowing Mother to relocate with Child, Father contends that the trial court erred in finding that Mother's proposed relocation was being made for a legitimate purpose. Father alternatively contends that even if the proposed relocation was being made for a legitimate purpose, the trial court erred in finding that the proposed relocation was in Child's best interests.

[19] No explicit criteria exist to determine whether a relocation is made in good faith and for a legitimate reason; however, "more than a mere pretext" is required. *T.L.*, 950 N.E.2d at 787. Relocating to be near family members or for employment are commonly acceptable reasons to support good faith and legitimacy. *Id.* at 787-88. "While the trial court may consider noncompliance with the notice provision and obstruction of parenting time as indicative of a parent's insidious intent, . . . these facts, of themselves, are not dispositive of the issue of a good faith, legitimate reason for relocating." *Gold v. Weather*, 14

N.E.3d 836, 842 (Ind. Ct. App. 2014), *trans. denied.* Therefore, while Mother's noncompliance with the notice requirements does not automatically demonstrate a lack of good faith or legitimacy, that noncompliance, nevertheless, may be considered as a factor in the trial court's determination of whether Mother was able to prove her move was in good faith and for legitimate reasons.

[20]     Here, the trial court acknowledged Mother's noncompliance with the notice requirements under the statute, finding that she was unaware of the requirements, but that she did notify Father personally of her wish to move. *Appellant's App. Vol. II* at 58. Mother testified that the main reason that she wished to relocate to Arizona was to pursue an employment opportunity. Mother worked as a real estate agent and had executed a contract with Jack Bataoel Real Estate in Arizona to work as a member of an expansion team and possibly become the expansion team leader for the greater Phoenix area. *Tr.* at 59. Prior to her move to Arizona, Mother had sought out other employment opportunities in northern Indiana over a two-year period and was not able to find a local opportunity comparable to her employment offer in Arizona. *Id.* at 115-16. Mother stated that the new position in Arizona was a significant pay increase from what she made while working in northern Indiana. *Id.* at 59-60. Mother stated that the opportunity for higher pay was due to home values being higher and more clients available in the Phoenix area. *Id.* at 60. In Mother's new employment, she would be considered an independent contractor and would only need to spend about six hours a day in the office doing work-related

activities. *Id.* at 64. During that time, Child would be put in a bilingual daycare located close to Mother's office. *Id.* Mother testified that, by living in Arizona, Child will be exposed to more cultural experiences than are available in northern Indiana. *Id.* at 65. "[I[t is common in our society that people move to live near family members, for financial reasons, or to obtain or maintain employment," and "we infer that these and similar reasons . . . are what the legislature intended in requiring that relocation be for 'legitimate' and 'good faith' reasons." *T.L.*, 950 N.E.2d at 787-88. We conclude that the trial court did not err when it found that Mother's relocation was made in good faith and for a legitimate reason.

[21]    Once the trial court found that Mother's request to relocate was made in good faith and for legitimate reasons, the burden switched to Father to prove that the proposed relocation was not in Child's best interest. *See* Ind. Code § 31-17-2.2-5(d). The first factor to consider under the relocation statute is the distance of the proposed relocation. Ind. Code § 31-17-2.2-1(b)(1). Evidence was presented that the proposed relocation to Arizona from Indiana involves a significant distance. There was also evidence that a relocation of such a substantial distance would cause hardship and additional expense for Father when he exercises visitation rights with Child because the distance between Indiana and Arizona is so great. Ind. Code § 31-17-2.2-1(b)(2) (second factor is hardship and expense for nonrelocating individual to exercise parenting time). The distance of the move would make it extremely difficult for Child and Father to have an ongoing relationship because Father would no longer be able

to have parenting time with Child on the weekends or midweek as he had been able to do prior to Mother's relocation. We have previously held that relocation was in a child's best interest where the parent-child relationship could be maintained long-distance through use of telecommunications in addition to in-person visitation. *Gold*, 14 N.E.3d at 845 (relocation from Indiana to Georgia allowed because modern technology, in addition to in-person visitation, made it feasible for the nonrelocating parent to maintain a meaningful relationship with the child)*; Keitzman v. Keitzman*, 992 N.E.2d 946, 950 (Ind. Ct. App. 2013) (allowing relocation to China where the nonrelocating parent's relationship with the child could be preserved through use of telecommunications and exclusive parenting time during the child's visits to the United States). However, in the present case, although Father and Child would be able to communicate through the use of telecommunications, the move would greatly impinge on Father's ability to have in-person visitation on a regular basis and enjoy weekend and midweek visitation with Child due to the distance of the relocation.

[22] As to the fourth factor to be considered, evidence was presented that Mother had never attempted to withhold time with Child from Father, and she testified that she would support and continue to further the relationship between Father and Child after her relocation. *Tr.* at 98. As to the reasons provided for Father opposing relocation, Father objected to Mother's move due to the expense and inconvenience of traveling between Arizona and Indiana for visitation and the feasibility of maintaining a close relationship with Child from such a long

distance.  Mother's stated reason for relocating was for her new employment in Arizona.

[23]  As to the "[o]ther factors affecting the best interest of the child," *see* Ind. Code §§ 31-17-2.2-1(b)(6), 31-17-2-8, the evidence showed that:  (1) Mother has been Child's primary caregiver since Child's birth; (2) Child was only two years old at the time of the court proceedings in this case; (3) Child has a strong bond with both parents; (4) both parents wished to have primary custody of Child; (5) Child was not involved in any activities in Indiana and had not yet started school; (6) Child had a very close relationship with Sutton, her maternal grandmother, and other members of Mother's family in Indiana; (7) Father had no other family in Indiana, but did have some cousins with young children who lived in Arizona, and Mother had been in contact with them; and (8) at the time of the hearing, Mother had not yet made any money in Arizona and was living in the vacation home of a previous employer.  This evidence indicated that Mother was removing Child from Father and other close family members to an area where there was little or no support system for her and Child.  Mother testified that relocation would improve her financial situation and, by implication, Child's, which may or not be the case because Mother was not yet making an income in her new employment at the time of the hearing, and her testimony regarding her possible $100,000 salary was not supported by the employment contract entered into evidence.  *Tr.* at 59, 131.  Based on the evidence presented, Mother's relocation to an area far from Father and Mother's family, who have been the basis of the support system for Mother and

Child, for new employment that raises questions regarding its certainty of financial improvement is not in the best interests of Child. Father has shown prima facie error in the trial court's conclusion that relocation was in Child's best interests. We, therefore, reverse the trial court's determination granting Mother's request to relocate with Child and remand for proceedings consistent with this opinion.

## II. Legal Custody

[24] Father argues that the trial court erred when it granted sole legal custody of Child to Mother. "Upon finding that a man is [a] child's biological father, the court shall, in the initial determination, conduct a hearing to determine the issues of support, custody, and parenting time." Ind. Code § 31-14-10-1. Indiana Code section 31-14-13-2.3(a) states that a trial court may award legal custody of a child jointly if the court finds that an award of joint legal custody would be in the best interest of the child. In determining if joint legal custody would be in the best interest of the child, the trial court should consider the following:

> (1) the fitness and suitability of each of the persons awarded joint legal custody;
>
> (2) whether the persons awarded joint legal custody are willing and able to communicate and cooperate in advancing the child's welfare;
>
> (3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;

(4) whether the child has established a close and beneficial relationship with both of the persons awarded joint legal custody;

(5) whether the persons awarded joint legal custody:

(A) live in close proximity to each other; and

(B) plan to continue to do so;

(6) the nature of the physical and emotional environment in the home of each of the persons awarded joint legal custody; and

(7) whether there is a pattern of domestic or family violence.

Ind. Code § 31-14-13-2.3(c).

[25] Here, the record reflects that Child was only two years old at the time of the proceedings, but had a close bond with both parents. The parties would not be living in close proximity to each other since Mother was relocating to Arizona and would have sole physical custody of Child, and Father was remaining in Indiana. The evidence further showed that there were some differences in the parties' beliefs for Child's educational needs, religion, discipline, and medical needs. Father testified that he would prefer to homeschool Child, but also expressed interest in sending her to a nearby Montessori school. *Tr.* at 49. Mother testified that for education, she would prefer Child to be in an atmosphere with low student-to-teacher ratios and a structured setting such as, "homeschooling where it's multiple children or a small private school," but she did not think that a Montessori school would be a good fit for Child. *Id.* at 99-

100. As for religion, Mother testified that, in general, she and Father shared religious beliefs, but she also said that Father leaned more toward the stricter side of religion and a stricter interpretation of the Bible, and she could envision a situation where one of them would have to make religious decisions alone. *Id.* at 103-04. As to discipline, Father stated that he believed in physical discipline in an appropriate setting, including spankings, slaps on the hands, and using a belt. *Id.* at 51. Mother testified that "[a]s a whole," she and Father agreed on discipline techniques, but that sometimes Father's disciplining of Child was "completely inappropriate," such as pinching, loudly yelling at Child and spanking with a belt numerous times. *Id.* at 92. In regard to medical needs, Mother stated that she and Father disagreed on some health issues, such as vaccines, and she expressed concern that there might be circumstances where she and Father could not agree on medical decisions and that Father might not be able to recognize when medical intervention was necessary. *Id.* at 102-03. Based on the record before us, the evidence supported the trial court's determination, and we conclude that it did not err when it granted sole legal custody to Mother.

[26] Affirmed in part, reversed in part, and remanded.

Bradford, J., concurs.

Baker, J., dissenting in part with separate opinion.

| | |
|---|---|
| In re the Paternity of Y.S.G., David M. Grimes, *Appellant-Petitioner,* <br><br> v. <br><br> Brooklynn A. Ross, *Appellee-Respondent* | Court of Appeals Case No. 18A-JP-161 |

**Baker, Judge, dissenting in part.**

[27] I respectfully dissent from the majority's conclusion that the trial court erred in finding that relocation is in Child's best interests. This is a very close case with substantial evidence supporting each parent's position, with statutory factors falling on both sides of the issue, and with two good parents trying to do what they respectively believe is best for their child.

[28] I believe that in such a close case—especially given that the majority agrees that the trial court properly granted sole legal custody to Mother—it is incumbent

upon us to defer to the trial court's assessment of the witnesses and evidence. As the majority correctly observes, we grant especially wide latitude and deference to trial judges in family law matters—for good reasons. It is in precisely close cases such as this one that I believe we must hew closely to our standard of review. In this case, I believe that the standard requires us to affirm in full. Therefore, I respectfully dissent from the majority's ruling regarding whether relocation is in Child's best interests.