**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 07 2012, 8:49 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**BRIAN D. LARSON**
Law Office of Charles P. Dargo, P.C.
Demotte, Indiana

ATTORNEY FOR APPELLEE:

**JOSEPH E. MORRISON**
Roselawn, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE MARRIAGE OF: | ) | |
| | ) | |
| TASHA ROSE, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 56A03-1109-DR-416 |
| | ) | |
| MELVIN ROSE, | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE NEWTON CIRCUIT COURT
The Honorable Jeryl F. Leach, Judge
Cause No. 56C01-0906-DR-24

**May 7, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Tasha Rose[1] ("Mother") appeals the trial court's grant of the motion for modification of custody, visitation, and child support ("Motion for Modification") filed by Melvin Rose ("Father"). Mother raises one issue which we revise and restate as whether the court's order on notice of relocation and petition to modify was clearly erroneous. We affirm.

The relevant facts follow. On May 27, 2010, a Decree of Dissolution and Order on Property Settlement, Custody, Parenting Time, Support and Rule to Show Cause (the "Dissolution Decree") was entered dissolving the marriage of Mother and Father. Mother and Father have two children together: J.R., a son who was eleven years old in August 2011 and is Father's son by adoption; and K.R., a daughter who turned six years old in August, 2011. Mother also has two other children: A., who was born in 2008, during the marriage between Mother and Father, but is not the son of father and is not considered a child of the marriage, and M., who was born in 2010. The court, in the Dissolution Decree, ordered that Father have custody of J.R. and Mother have custody of K.R., that the parents would be entitled to parenting time pursuant to the Indiana Parenting Time Guidelines "at a minimum," and that "[t]he children shall be together for all parenting time as agreed by the parties." Appellant's Appendix at 16. K.R. has been in the physical custody of Mother since 2009 when Mother began living apart from Father.

During the marriage and following the Dissolution Decree, both Mother and Father lived in Newton County, Indiana. Although Mother has had custody of K.R. since

---

[1] Mother testified at the hearing that her last name is now Smith. To limit confusion, we refer to Mother as Tasha Rose, which is consistent with the case caption.

2009, Father has been active in the life of K.R. Father tries to "do as much as [he] can" and has taken K.R. on a field trip, went to her "Christmas functions," has attended K.R.'s parent-teacher conferences during her kindergarten school year, and has taken "a layoff from work" to babysit K.R. Transcript at 22-23. Father also pays for K.R.'s cheerleading activities. K.R. "hangs on [Father] all the time," and "[c]onstantly [tells] him she loves him." Id. at 51.

In addition, the parents' extended families live in the same area. The children see their maternal grandmother approximately once a month. Father's side of the family, including Father's parents, other grandchildren, aunts, and uncles, see K.R. and J.R. "probably every weekend," and there are many family events including fish fries and other parties. Id. at 23.

On March 30, 2011, Mother married Jeremiah Smith, who is in the United States Army. Although Mother and Father had not divorced until May 2010, Mother dated Smith for two years before marrying him. Smith is also the father of M. Although Smith was originally stationed in California, Mother did not move or request to relocate there because "he was requesting to be transferred again" and Mother did not want to relocate "more than once." Id. at 10.

On June 9, 2011, Mother filed a verified notice of intent to move pursuant to Ind. Code § 31-17-2.2-1, after which Father filed his Motion for Modification on July 6, 2011. In Mother's notice, she stated that she had remarried, that she "intended to move to Hawaii in August, 2011, prior to the start of the new school year," that "the intent to move is not to intentionally damage [K.R.'s] relationship with her father," and that she

3

"is willing to maintain a healthy relationship between [K.R.] and her father." Appellant's Appendix at 19. Although Mother and Smith do not have a home in Hawaii yet, the government would be providing a home for them. Mother intends to enroll K.R. in school "[o]n post." Transcript at 11. Mother also intends to take classes to become a childcare provider from her home, in which she will be able to provide child care to a total of six children, including her own.

On August 3, 2011, the court held a hearing on the notice of relocation and father's objection and petition for modification regarding K.R.[2] Mother testified that she wanted K.R. to maintain a relationship with Father and that the move was not for the purpose of separating K.R. from Father.

At the hearing, Mother submitted a proposed visitation schedule ("Visitation Schedule") regarding both J.R. and K.R. which stated:

1. **Thanksgiving break** – [Mother] shall pay roundtrip ticket for [J.R.] from Chicago to Honolulu, HI. [Mother] shall exercise the Thanksgiving holiday with both children in Hawaii.

2. **Christmas break** – [Mother] shall pay her own airfare to travel with [K.R.] and be responsible for fifty (50%) percent of [K.R.]'s airfare from Honolulu, HI to Chicago. [Father] shall exercise Christmas holiday with both children.

3. **Spring break** – shall be alternated between both parties with [Mother] having even years and [Father] having odd years. During even years, [Mother] shall be responsible for seventy-five (75%) percent of [J.R.'s] airfare and during odd years, [Mother] shall pay her own airfare to travel with [K.R.] and be responsible for fifty (50%) percent of [K.R.'s] airfare from Honolulu, HI to Chicago.

---

[2] The court noted at the outset of the hearing that "there is a Petition to Modify with respect to the parties' son and I believe the Court has set that for a hearing at a later date . . . ." Transcript at 4.

4. **Summer break** – [Father] shall receive eight (8) weeks of the twelve (12) week break. Each party shall be responsible for fifty (50%) percent of [J.R.] and [K.R.]'s airfare.

Mother's Exhibit B. The Visitation Schedule also stated, and Mother reiterated in her testimony, that round trip airfare from Hawaii to Chicago, which is the closest airport to Father, averages between $645 and $1,230.

Mother testified that while Father did obtain counseling for J.R., he refused to tell her who the doctor was or provide contact information. She testified that there was one weekend where Father wanted to parent K.R. so that K.R. could attend an event for Father's sister's wedding, and Mother refused because it was Mother's birthday. Mother stated that Smith plans on staying in the military for his career, and in that capacity he may have to relocate frequently, that there are "no [army] bases here in Indiana," and that it is possible that she might never move back to Indiana. Transcript at 17.

Father testified he has noticed that there has not been an emotional bond between Mother and K.R. since the divorce and related a story in which K.R. became scared when she could not avoid colliding with J.R. as the two children were going down a slide, and when K.R. started crying, Mother "grabbed her and said, '[K.R.], you need to grow up and stop whining.'" Id. at 24. Father testified that J.R. and K.R. presently have a close relationship and that K.R. has been an emotional wreck while at school and that she cries when Father transports her to Mother's residence. Father testified that Mother has changed residences three times since the May 2010 divorce and that, once, K.R. was confused about which bus she rode and she was missing for fifteen minutes. Father agreed about Mother's statements regarding the costs to travel to Hawaii, but he noted

5

that those costs were for "off seasons" and that flights for holidays and spring break would cost more. Id. at 28. Father testified that he would have to "scrimp and save" to fly to Hawaii once per year and that he had earned $21,000 in 2011 as of July 23. Id. at 29.

Father stated that he might be able to speak with K.R. only on weekends were K.R. to move to Hawaii because of the five hour time difference and how that would conflict with his work schedule, and that at present he speaks with K.R. once or twice a day. He said that, were K.R. to move, he would not be able to attend her school activities or doctor appointments. Father testified that Mother has made threats to not let him exercise parenting time and that the previous summer Mother denied Father parenting time such that he received only twenty-six days of parenting time. Father testified that he had K.R. the weekend that Mother remarried, and that the next weekend Mother denied him parenting time and explained to him: "You had them the past two weekends," to which Father replied: "I didn't get married on my weekend." Id. at 33. Father testified that during the past Christmas holiday, Mother and Father made arrangements for parenting time, but that Mother modified the arrangement and Father was forced to agree to Mother's terms for him to see his children on Christmas. Father also testified that Mother eavesdrops on his phone conversations with the children and that almost every time Father phones Mother to talk with his children, Mother does not answer and Father has to wait anywhere from fifteen minutes to three hours to get a return phone call from K.R. despite calling at around the same time every day.

When asked whether Mother has tried to damage his relationship with his children, Father testified about an incident in June of 2010 in which Mother was angry with Father and "she looked at [him] and she smiled" and stated that she was "going to introduce [J.R.] to his biological father." Id. at 35. Father then told J.R. that J.R. was adopted. Father also testified about an incident around the time of the divorce in which he was injured and on medication, that he "hallucinated that [he] took too many pills," and that although his medical records demonstrate that he did not actually overdose, Mother told J.R. "that [he] took those pills and tried to kill" himself. Id. at 36.

On August 10, 2011, the court issued its order on notice of relocation and petition to modify which stated:

> . . . . Mother's decision to relocate to the State of Hawaii is the result of her desire to live with her current husband who was stationed in Hawaii through the United States Army. Mother has physical possession of a child she has in common with her new husband and the relocation will allow that child to reside with her father. Mother will receive vocational training and a daycare certification, as well as assistance in setting up a home based business if she relocates to Hawaii. The court finds that Mother's decision to move is made in good faith and for a legitimate reason.

> Mother has resided in Newton County, Indiana, since the Dissolution Decree was entered in this Case on May 27, 2010. Since the entry of the Decree, Mother has lived in two different houses in Kentland, Indiana; one in Brook, Indiana; and currently lives in Morocco, Indiana. Father has lived in Sumava Resorts, Newton County, Indiana, since the entry of the Dissolution Decree. Mother and Father have not lived more than 30 miles apart since the Dissolution Decree was entered. If the Court grants Mother's request to relocate with one of the children, she and the child will be living approximately 4,300 miles apart from Father. It takes between 8 and 9 hours to fly between Hawaii and the closest airport to Father (which is in Chicago, Illinois). The distance involved in the proposed change of residence is significant and will necessitate a drastic change to Father's current parenting time schedule.

7

Mother has proposed a visitation schedule that would have at least one of the children traveling between Hawaii and Chicago on four occasions each year. Mother's proposed visitation scheduled [sic] appears to suggest that she would also have summer break visitation with [J.R.] each year. In that event, at least one child would be traveling between Hawaii and Chicago on five occasions each year. Mother's schedule would allow Father to visit with [K.R.] on three occasions during odd years and on two occasions during even years.

Round trip airfare between Hawaii and Chicago averages between $645.00 and $1230.00 per person. Mother has agreed to pay for her own airfare to travel whenever [K.R.] would be making the trip. Mother has agreed to pay for a portion of the cost for [K.R.] and [J.R.] to travel. Mother makes no provision for an adult to travel with 11 year old [J.R.] on any of the proposed visits and makes no provision for an adult to fly with [K.R.] for Summer Break visitation. The total cost for airfare if Mother's visitation schedule is used would range between $3,547.50 and $6765.00. This would be increased by $2,257.50 and $4,305.00 if an adult is to fly with [J.R.] on each trip and an adult is to accompany [K.R.] for her summer break visit.

Mother would be responsible for a majority of the airfare expenses under her visitation plan. However, Father would still be left with thousands of dollars in airfare expenses alone just so he could have a couple visits with his daughter each year. Father currently earns $42,000.00 per year. Airfare costs alone could quickly exceed 10% of Father's annual gross income. The relocation of Mother and [K.R.] creates the real possibility of financial hardship for Father in the exercising of his parenting time.

Father has enjoyed significant parenting time with [K.R.] since the entry of the Dissolution Decree. Father's parenting time has been regular and consistent. Father has been active in [K.R.'s] extracurricular activities, school events, school work, and medical care. Father's extended family is located near Father's home and they interact with the children on a regular and substantial basis. Mother's parents are also located near Father's home and they have contact with the children. The only family Mother will have in Hawaii is her new husband and their child. On occasion, Mother's new husband will have visits from his children of a different relationship.

The evidence shows that [K.R.] has developed a strong tie to her Father as exhibited by such episodes as her crying when he dropped her off

for school and her becoming emotional when Father returns her to Mother's house at the end of parenting time.

There is a 5 hour time difference between Father's house and Mother's proposed new location in Hawaii. This will limit the period of time during which Father will be able to communicate with [K.R.] if she were to relocate to Hawaii, especially considering Father's normal work schedule. The physical distance between Father's house and Hawaii will significantly reduce the frequency of [K.R.'s] contact with her Father, his family, and Mother's parents. The time and distance involved in Mother's proposed relocation will interfere with the preservation of [K.R.]'s relationship with her Father.

Stability in Mother's home has been an issue with Mother's numerous changes of residences in the past year. Mother's new husband plans on a career enlistment in the military. There is a high likelihood that Mother's new husband will be transferred periodically while enlisted in the military. This likelihood further threatens the stability of the family.

Mother has exhibited a pattern of conduct involving limiting Father's parenting time by changing or cancelling scheduled visits. Mother has threatened to withhold periods of visitation if Father did not agree to Mother's proposed changes to or reduction of previously scheduled parenting time. Mother has interfered with Father's phone communication with his children. . . .

Appellant's Appendix at 6-8. The court concluded that "[r]elocation of [K.R.] to Hawaii while Father remains in Indiana is not in the best interest of [K.R.]. Moreover, there has been a substantial and continuing change in circumstance since the entry of the last custody Order in this case . . . ." Id. at 8. The court ordered that K.R.'s custody be modified and awarded Father custody. Mother was granted visitation pursuant to the Parenting Time Guidelines, specifically referencing Section III.

The issue is whether the court's order on notice of relocation and petition to modify was clearly erroneous. Where, as here, the court entered findings and conclusions under Ind. Trial Rule 52(A), our standard of review is well settled:

9

[W]e must first determine whether the record supports the factual findings, and then whether the findings support the judgment. On appeal, we will not set aside the findings or judgment unless they are clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses. We therefore consider only the evidence favorable to the judgment and the reasonable inferences flowing therefrom, and we will neither reweigh the evidence nor assess witness credibility. A judgment is clearly erroneous when there is no evidence to support the findings, the findings do not support the judgment, or the trial court applies the wrong legal standard to properly found facts.

T.L. v. J.L., 950 N.E.2d 779, 783 (Ind. Ct. App. 2011) (quoting M.S. v. C.S., 938 N.E.2d 278, 281-82 (Ind. Ct. App. 2010)), reh'g denied. "We may affirm the trial court on any legal theory supported by the factual findings even if the trial court used a different legal theory." Id. (citing Mitchell v. Mitchell, 695 N.E.2d 920, 923 (Ind. 1998)). "Before affirming on a legal theory supported by the findings but not espoused by the trial court, we should be confident that our affirmance is consistent with all of the trial court's factual findings and inferences reasonably drawn therefrom." Id. at 783-784.

In addition to the standard of review under Trial Rule 52, the Indiana Supreme Court has expressed a "preference for granting latitude and deference to our trial judges in family law matters." Id. at 784 (quoting In re Marriage of Richardson, 622 N.E.2d 178, 178 (Ind. 1993))). The Court has "recently re-emphasized this principle, stating that we afford such deference because of trial judges' 'unique, direct interactions with the parties face-to-face.'" Id. (quoting Best v. Best, 941 N.E.2d 499, 502 (Ind. 2011)). "Thus enabled to assess credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the

10

involved children." Id. (quoting Best, 941 N.E.2d at 502); see also Kirk v. Kirk, 770 N.E.2d 304, 307 (Ind. 2002). "Therefore, we 'will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment. The concern for finality in custody matters reinforces this doctrine.'" Id. (quoting Baxendale v. Raich, 878 N.E.2d 1252, 1257-58 (Ind. 2008)).

Under Chapter 2.2, there are two ways to object to a proposed relocation under the relocation chapter: a motion to modify a custody order, Ind. Code § 31-17-2.2-1(b), and a motion to prevent relocation of the child, Ind. Code § 31-17-2.2-5(a). Baxendale, 878 N.E.2d at 1256 n.5. Upon request of either party, the trial court shall hold a full evidentiary hearing to grant or deny a motion to prevent relocation of the child. Ind. Code § 31-17-2.2-5(b). "The relocating individual has the burden of proof that the proposed relocation is made in good faith and for a legitimate reason." Ind. Code § 31-17-2.2-5(c). If the relocating parent meets that burden, "the burden shifts to the nonrelocating parent to show that the proposed relocation is not in the best interest of the child." Ind. Code § 31-17-2.2-5(d). When a relocation is made in good faith, the analysis ultimately turns on the best interests of the child. Baxendale, 878 N.E.2d at 1256 n.5.

In considering the proposed relocation, the trial court shall take into account the following factors:

(1)    The distance involved in the proposed change of residence.

(2)    The hardship and expense involved for the nonrelocating individual to exercise parenting time. . . .

11

(3)     The feasibility of preserving the relationship between the nonrelocating individual and the child through suitable parenting time . . . including consideration of the financial circumstances of the parties.

(4)     Whether there is an established pattern of conduct by the relocating individual, including actions by the relocating individual to either promote or thwart a nonrelocating individual's contact with the child.

(5)     The reasons provided by the:

    (A)     relocating individual for seeking relocation; and

    (B)     nonrelocating parent for opposing the relocation of the child.

(6)     Other factors affecting the best interest of the child.

Ind. Code § 31-17-2.2-1(b) (the "Relocation Statute"); see T.L., 950 N.E.2d at 784-785 (citing Swadner v. Swadner, 897 N.E.2d 966, 976 (Ind. Ct. App. 2008) (applying these factors to consideration of a motion to prevent relocation)). The "'[o]ther factors affecting the best interest of the child' include, by implication, the factors set forth for custody determinations and modifications under Indiana Code section 31-17-2-8."[3] T.L., 950 N.E.2d at 785 (quoting Baxendale, 878 N.E.2d at 1257).

---

[3] Ind. Code § 31-17-2-8 ("Section 8") provides:

The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:

    (1)     The age and sex of the child.

    (2)     The wishes of the child's parent or parents.

    (3)     The wishes of the child, with more consideration given to the

12

In arguing that some of the court's findings were clearly erroneous, Mother makes frequent reference to a recent case from this court, In re Paternity of X.A.S., 928 N.E.2d 222 (Ind. Ct. App. 2010), trans. denied, arguing that the issue in that case was "very similar" to the instant appeal. Appellant's Brief at 7. In X.A.S., this court reversed the trial court's denial of a petition to relocate with X.A.S. filed by the father and grant of a petition to modify custody to the mother. X.A.S., 928 N.E.2d at 230. The father in X.A.S. had petitioned to relocate with X.A.S., whom father had been the custodial parent of for the past nine years, to San Diego, California, where his new wife was stationed in the United States Navy. Id. at 223. This court acknowledged in reversing that "while it is a close call, the record simply does not contain sufficient evidence to support a change," finding "that a number of findings are not supported by the evidence, that a

---

child's wishes if the child is at least fourteen (14) years of age.

(4)     The interaction and interrelationship of the child with:

    (A)     the child's parent or parents;

    (B)     the child's sibling; and

    (C)     any other person who may significantly affect the child's best interests.

(5)     The child's adjustment to the child's:

    (A)     home;

    (B)     school; and

    (C)     community.

(6)     The mental and physical health of all individuals involved.

(7)     Evidence of a pattern of domestic or family violence by either parent. . . .

13

number of inferences drawn from the facts are unreasonable, and that the judgment is not supported by the remaining findings . . . ." Id.

The X.A.S. court drew particular attention to the following statement by the trial court at the conclusion of the hearing:

> I haven't heard yet today how it's best for [X.A.S.] to move. I've heard all about how it's great for dad. I have a hard time understanding folks who choose romantic partners over their children, but it's your choice to make, sir. If you remain here, [X.A.S.] remains here with you. If you leave, custody transfers to mom.
>
> . . . I understood dad's testimony today as dad is moving regardless. I find that kind of disturbing. I don't understand folks who can move clear across the country from their kids. But I've never done it, never been faced with that choice, so it's hard for me to judge dad's rationale, but that's in no way good for [X.A.S.].

Id. at 224. This reasoning impacted the trial court's findings regarding at least two of the Relocation Statute factors, which in each case this court found to be clearly erroneous. Specifically, regarding the third factor of the feasibility of preserving the relationship between the mother and child, the trial court found that "Father's insistence on moving with or without his son effectively robs [X.A.S.] of one of his parents." Id. at 226. This court noted that "[t]his finding casts aspersion on Father" and that "[t]o imply that Father's decision in this regard is selfish, causing unwarranted harm to X.A.S., is not supported by the evidence in the record." Id. at 227. Also, regarding the final factor, in which the court is to evaluate factors affecting the best interest of the child, the trial court found that "Father advanc[ed] his romantic interests ahead of the child's interests. . . ." Id. This court concluded that this finding was not supported by evidence in the record, noting:

14

Father got married, and to characterize this relationship as "his romantic interests" is to minimize it to an untenable degree. And to suggest that by getting married Father was somehow failing as a parent creates a standard that is too high for any of us to meet. Parents must occasionally make sacrifices for the sake of their children, but they need not sacrifice everything. Father was not required to choose between marriage and parenting—he can have both.

Id.

The court concluded as follows:

Upon removing the findings of fact that are without support in the record and the unreasonable inferences that were drawn from the facts, the findings that remain are as follows: California is a very long distance from Indiana. Father did not attend parent/teacher conferences and could only remember the name of X.A.S.'s most recent teacher. Mother lives a stable life. X.A.S. was actively involved in sports activities in Indiana. Mother is not seeking modification to gain a financial advantage.

When those findings of fact are considered along with the facts that Father has been X.A.S.'s primary caregiver and custodial parent for nine years, has provided X.A.S. with a stable and healthy life, and has been involved with X.A.S.'s academic and athletic activities, we believe that the trial court's judgment denying Father's request to relocate with X.A.S. and granting Mother's petition to modify custody was clearly erroneous.

Id. at 229. The court reiterated in its conclusion that although "this is a close case, [] because X.A.S. has spent nine of his twelve years living with his Father, we believe that it is in his best interests to continue to do so." Id. at 230.

Father makes arguments distinguishing X.A.S., which we will recite below in the context of the individual factors, suggesting that the instant case is more akin to the recent case of T.L. in which this court affirmed the trial court's grant of the father's motion to prevent the mother's relocation with their two sons to Tennessee. 950 N.E.2d at 791. This court concluded that although the proposed relocation of the children was in

15

good faith and for legitimate reasons, the evidence supported the trial court's conclusion that relocation was not in the children's best interest and was therefore not clearly erroneous. Id. The mother in T.L. had primary physical custody, with the father exercising parenting time, and the mother testified at the hearing that she would not relocate herself were the court to deny relocation. Id. at 781-782.

In holding that relocation was not in the best interest of the children, this court noted that, according to our standard of review, "the issue is not whether we would have made the same decision that the trial court did, but whether the trial court's findings that are supported by the evidence—disregarding those few that were unsupported—are sufficient to sustain its decision." Id. at 790. The court noted that the trial court received evidence of academic success, physical and mental health, participation in activities, and that the children were "well adjusted" to their local community. Id. The court noted that the "Father's mother and siblings testified that the boys enjoy a close and supportive relationship with them in Montgomery County" and that the trial court "reasonably found that those relationships would suffer if the relocation was approved because Father's parents would no longer be able to see the boys weekly or regularly attend their sporting events and school activities," and also that the children would not "be able to attend as many holiday and summer gatherings with Father's entire family." Id.

The T.L. court also distinguished X.A.S., noting that "[i]nsofar as X.A.S. reversed a modification of custody, its reasoning is inapplicable to the present case where the trial court ordered the parties to maintain the status quo of Mother residing in Montgomery County and continuing to have primary physical custody of the children." Id. at 791.

16

The court also noted that "the parents had a 'cordial' relationship for nine years following the award of custody to the father [and] there was no evidence of a pattern to thwart the mother's relationship with the child," and therefore there was "every indication that with suitable parenting time, the son could preserve his relationship with the mother despite the distance involved in the relocation." Id. We also highlighted that the child in X.A.S. expressed a desire to move with the father. Id. We concluded: "Here, due to Mother's and Father's strained relationship, the facts are not so favorable to Father's ability to continue the present quality of his relationship with the boys if the relocation is approved, and the evidence is disputed that the boys wish to move to Tennessee with Mother." Id.

With this in mind, we turn to the court's order and analyze it in the context of the factors set forth in the Relocation Statute and Section 8.

*The distance involved in the proposed change of residence.*

Mother seeks to relocate with K.R. to Hawaii, which is a distance of approximately 4,300 miles from Father, covers five time zones, and which requires an eight to nine hour flight to traverse. There is little debate that the physical distance involved in the proposed move is extreme.

*The hardship and expense involved for Father to exercise parenting time.*

The court found that, based upon the visitation schedule proposed by Mother, the airfare costs "would range between $3,547.50 and $6[,]765.00," and that "[t]his would be increased by $2,257.50 and $4,305.00 if an adult is to fly with [J.R.] on each trip and an adult is to accompany [K.R.] for her summer break visit." Appellant's Appendix at 7. Thus, it is conceivable that airfare costs could range upwards of $10,000 per year. The

17

court found that although, under the visitation proposal, "Mother would be responsible for a majority of the airfare expenses," Father "would still be left with thousands of dollars in airfare expenses alone just so he could have a couple visits with his daughter each year." Id. The court also found that Father currently earns $42,000 per year and that airfare "could quickly exceed 10% of Father's annual gross income" which it concluded would be a financial hardship. Id.

Mother argues that "Father would only be required to incur between $967.00 and $1,845.00 to exercise visitation with the child" which "does not support the trial court's finding that airfare costs would create a financial hardship," noting that "the minimal expense associated with 50% of the child's travel cannot be considered so excessive is [sic] to warrant a modification of custody." Appellant's Brief at 12. Father argues that, unlike in X.A.S., in which the relocating parent offered to pay for *all* of the travel associated with parenting time, Mother proposes to pay for only part of the expense.

We find that the court reasonably concluded that the airfare expenses which would result were K.R. to relocate to Hawaii would cause Father financial hardship. Indeed, we note that Mother does not challenge the trial court's findings regarding the additional airfare not contemplated by the visitation schedule in that the schedule "makes no provision for an adult to travel with 11 year old [J.R.] on any of the proposed visits and makes no provision for an adult to fly with [K.R.] for Summer Break visitation," and thus an additional "$2,257.50 and $4,305.00" may be expended to complete the necessary annual travel. Appellant's Appendix at 7.

18

*The feasibility of preserving the relationship between Father and K.R., including the consideration of financial circumstances of the parties.*

The court found that due to Father's work schedule, the five hour time difference "will limit the period of time during which Father will be able to communicate with" K.R. and that "[t]he physical distance between Father's house and Hawaii will significantly reduce the frequency of [K.R.'s] contact with her Father, his family, and Mother's parents." Id. Mother argues that, similar to X.A.S., the proposed visitation schedule is in excess of the parenting time guidelines recommendation when distance is a major factor, and that Father's testimony indicated that "it would only be 9:00 p.m. at his home when [K.R.] returns home from school" and thus he would be able to speak with her on a nightly basis. Appellant's Brief at 13. Mother argues that "like the non-custodial parent in *X.A.S.*, Father and the child would be able to speak on the phone frequently, communicate via email, and send letters to each other." Id. at 13.

Father argues that T.L. is more instructive because in that case, as in the case here, the court found significant the non-relocating parent's very supportive relationship with the children and that if the children were relocated, father would be deprived of seeing the children on a daily basis. Appellee's Brief at 15. Father argues that Mother's arguments regarding speaking on the telephone "assume[] that [K.R.] would get home from school in Hawaii at 4:00 p.m. in the afternoon" and "fail[] to consider . . . any school related activities or other events." Id. at 15-16. Father argues that "Mother's argument indicating that Father can remain in contact with his five (5) year old daughter via email and correspondence is simply not reasonable." Id. at 16. Father also notes that

19

K.R.'s contact with her brother J.R. and Father's extended family would be severely restricted.

Here, the court reasonably concluded that the time and distance involved in the proposed relocation will interfere with the preservation of the relationship between Father and K.R. As Father notes, communication between Father and five-year-old K.R. by email or letter is not reasonable for the foreseeable future, and the five hour time difference may limit severely Father's ability to communicate with K.R. by telephone. The court reasonably concluded that Father and K.R. currently enjoy a "strong tie" to one another. Appellant's Appendix at 7.

*Whether there is an established pattern of conduct by Mother to thwart Father's contact with K.R.*

The court found that "Mother has exhibited a pattern of conduct involving limiting Father's parenting time by changing or cancelling scheduled visits," that she "has threatened to withhold periods of visitation if Father did not agree to Mother's proposed changes to or reduction of previously scheduled parenting time," and that she has "has interfered with Father's phone communication with his children." Id. at 8. Mother asserts that the evidence presented did not amount to a pattern of conduct by Mother to thwart Father's contact with K.R. and that the only time she did not allow Father a requested visitation was on Mother's birthday. Regarding Father's testimony that, when he was still a student, Mother refused to allow him visitation after his school day ended, Mother notes that Father "also testified that he did have visitation three weekends per month and some other days sporadically throughout the summer" which is in excess of

20

the Indiana Parenting Time guidelines. Appellant's Brief at 13. Mother argues that although Father testified that Mother denied him parenting time during K.R.'s spring break, he "acknowledged that he did have the children for the prior two weekends." Id. at 14. Regarding phone communication, Mother argues that Father's testimony admits that he is able to talk to K.R. every day and that his calls are returned.

Father argues that Mother waived her argument regarding the Guidelines because it was not made to the trial court, and even if not waived, "Mother cannot even establish that Indiana Parenting Guidelines applied in this instance because Father testified that Mother and Father were to share the summer equally." Appellee's Brief at 23. Father argues that while "he was supposed to receive equal or half of [K.R.]'s summer vacation . . . he only received . . . twenty-six (26) days." Id. Father argues that despite Mother's statement that he had K.R. the previous two weekends, he was still denied spring break parenting time. Id. Father argues that Mother unilaterally changed the parenting time arrangement which had been worked out for Christmas 2010, and unless he agreed to the change he would have been denied parenting time. Father also references evidence in the record that Mother eavesdrops on his conversations with K.R. and that she never picks up his calls and instead he must wait "from fifteen (15) minutes to three (3) hours" for K.R. to return the phone call. Id. Father argues that other evidence exists in the record supporting the court's findings and conclusions, notably that "the court could infer Mother's intent and motives when Mother threatened to tell their son [J.R.] that [J.R.] was adopted and that Father was not his biological father." Id. Father also argues that it is this factor which most distinguishes this case from X.A.S. because unlike in X.A.S.,

21

"in this case, ample evidence exists in the record indicating that Mother has shown a pattern of thwarting the relationship of Father and his children." Id. at 25.

As noted in T.L., where distance is a significant factor in a relocation, a "high level of cooperation [is] required on the part of parents . . . in order for both to maintain strong relationships with their children . . . ." 950 N.E.2d at 789. Here, the court identified multiple instances in which Mother and Father failed to cooperate and attributed that failure to Mother. The evidence favorable to the court's judgment supports the court's conclusion denying relocation.

*The reasons provided by Mother for seeking relocation and Father for opposing relocation.*

Mother argues that she "has remarried to a member of the military and, as a result is being relocated to Hawaii" and that "[t]his is, without question, a valid basis for her request to relocate and does not suggest that she is failing as a parent or otherwise does not have her children's best interests at heart." Appellant's Brief at 15. Father argues that the relationship between K.R. and him, as well as with his extended family, would suffer from extreme hardship were K.R. to relocate to Hawaii. As in T.L., evidence favorable to the trial court's judgment suggests that Father, like Mother, has good faith and legitimate reasons for his position in this matter. 950 N.E.2d at 789-790.

*Other factors affecting the best interest of K.R.*

Regarding other findings by the court affecting the best interest of K.R., evidence was presented regarding the stability in Mother's home, and the court issued a finding highlighting the "numerous changes of residences in the past year" and the fact that

"Mother's new husband plans on a career enlistment in the military" which creates "a high likelihood that Mother's new husband will be transferred periodically while enlisted" and "[t]his likelihood further threatens the stability of the family." Appellant's Appendix at 7.

Mother mentions that the evidence shows merely that, as a result of her planned move to Hawaii, she has been forced to make several temporary changes in residence, and that such evidence does not suggest an adverse impact on the child nor does it reflect continuous, ongoing, instability. Mother argues that "the opposite appears to be the case" because she "is relocating to Hawaii to live with her husband" and "[s]he has made arrangements to complete classes to be a childcare provider . . . ." Appellant's Brief at 16.

Father asserts that Mother has never lived as a family unit with her new husband, who enjoys parenting time with three children of his own. He notes Mother's testimony that subsequent to the divorce, she has lived in four separate residences in the towns of Kentland, Brook, and Morocco, Indiana, and now wants to move to Hawaii. Father argues that evidence was presented indicating that K.R. or her teacher "was confused" and K.R. "got on the wrong bus to go home from school and was actually missing for a period of fifteen (15) minutes." Appellee's Brief at 20. He points to Mother's testimony that, due to Smith's career choice, it was "highly likely that she would never return to Indiana," and argues that "[h]aving to relocate every two (2) years as required by the military will further threaten the stability of the family." Id. at 20-21.

23

Even assuming that Mother's arguments that the court's findings related to the stability of her home were clearly erroneous, however, based upon the above the court's remaining findings were sufficient to sustain its decision. See T.L., 950 N.E.2d at 790 ("Applying our standard of review, the issue is not whether we would have made the same decision that the trial court did, but whether the trial court's findings that are supported by the evidence–disregarding those few that were unsupported–are sufficient to sustain its decision."). Here, similar to T.L., although Mother's proposed relocation was in good faith and for a legitimate reason, the vast majority of the court's findings were reasonably supported by evidence presented at the hearing, and accordingly we conclude that the court's order on notice of relocation and petition to modify was not clearly erroneous.

Finally, Mother argues that "[l]ike in *X.A.S.* the most important factor contained in the record is that Mother has been the child's primary caregiver for her entire life. While moving away from Father would undoubtedly cause upheaval in the child's life, it would cause far greater upheaval to tear the child away from" Mother. Appellant's Brief at 17. In X.A.S., the court found "under the general factor of the best interests of the child," the fact that X.A.S. has lived with Father for the past nine years was "one of the most important facts contained in the record." 928 N.E.2d at 229. Father argues that again, X.A.S. is not instructive because "Mother has only had custody of [K.R.] for a little over one (1) year as opposed to nine (9) years. Further, at the time of the hearing, the child was five (5) years old and the child in *In re: X.A.S.* was approximately twelve (12) years old." Appellee's Brief at 14-15. We agree with Father that, to the extent that this court

24

in <u>X.A.S.</u> found persuasive the fact that the father had been the child's primary custodian for nine years, here the family unit has not been dissolved for nearly as long, and the child at issue is far younger than the child in that case.[4]

For the foregoing reasons, we affirm the trial court's order on notice of relocation and petition to modify.

Affirmed.

MAY, J., and CRONE, J., concur.

---

[4] To the extent that we are to apply the factors provided in Ind. Code § 31-17-2-8, we note that they have been taken into consideration above. <u>See</u> <u>X.A.S.</u>, 928 N.E.2d at 229.