
FILED

Jan 11 2024, 8:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Thomas B. O'Farrell
McClure | O'Farrell
Zionsville, Indiana

ATTORNEY FOR APPELLEE

Rodney T. Sarkovics
Sarkovics Law
Carmel, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jessica Pilkington, | January 11, 2024 |
| *Appellant-Petitioner,* | Court of Appeals Case No. 23A-DC-575 |
| v. | Appeal from the Hamilton Superior Court |
| Caleb Pilkington, | The Honorable P. Chadwick Hill, Magistrate |
| *Appellee-Respondent.* | Trial Court Cause No. 29D05-2112-DC-8687 |

**Opinion by Judge Kenworthy**
Chief Judge Altice and Judge Weissmann concur.

**Kenworthy, Judge.**

## Case Summary

[1] Caleb Pilkington ("Father") and Jessica Littrell[1] ("Mother") were married in 2013 and welcomed a daughter ("Child") in 2020. Mother petitioned for dissolution of the marriage in December 2021. While these proceedings were pending, Mother gave notice of her intent to relocate with Child. A magistrate presided over the provisional and final hearings and signed an order settling property- and child-related issues in February 2023. Mother appeals, raising three issues:

1. Did the magistrate have authority to sign the final order?

2. Did the trial court err in denying Mother's motion to relocate with Child?

3. Did the trial court err in awarding the parties joint legal custody of Child?

[2] We conclude that under current statutes, the magistrate had authority to sign the final order, and the decisions about relocation and joint custody are not clearly erroneous. Therefore, we affirm.

## Facts and Procedural History

[3] Mother was raised in Utah and moved to Indiana in 2010 for college. Her parents, her grandfather, and her brother and his family still live in Utah, but

---

[1] Mother's maiden name of Littrell was restored as part of the dissolution decree.

she also has some relatives in Indiana she sees occasionally. Father was raised in Indiana and his father, mother and stepfather, and younger brothers as well as aunts, uncles, and cousins live in Central Indiana.

[4] Father and Mother were married in 2013 while Mother was still in college. Mother obtained a graduate degree in occupational therapy in 2018 and holds two positions in Indiana—as director of a clinic and as an in-home provider for First Steps. In 2022, Mother accepted a job in Utah. While these proceedings remained pending, she continued working at her two local jobs while also working remotely at the Utah job. Father is an hourly employee at Beck's Hybrids. Although he often goes to work early in the morning and works longer hours during certain times of year, his schedule is flexible.

[5] Father and Mother welcomed Child in April 2020. Mother breastfed Child and Father's "job" was to prepare and freeze milk Mother pumped. *Tr. Vol. 4* at 108. Father assisted in bathtime by being "the drier" and gave Child an occasional bottle. *Id.* He also changed diapers regularly, especially at night. Covid-19 pandemic restrictions affected Father's ability to attend medical appointments with Mother and Child in the months after Child's birth.

[6] Father continued to work in person during the pandemic and returned to work about a week after Child's birth. Mother returned to work six weeks after Child's birth, initially on a part-time hybrid schedule. She eventually worked up to being in person four days a week. On the days both parents worked outside the home, Father's mother ("Grandma") cared for Child in Grandma's

home. Father's and Mother's work hours were a little offset: Father went to work early, and Mother took care of Child and dropped her off at Grandma's in the morning; then Father picked up Child and took care of her while Mother worked a little later in the evening. Mother then considered bathtime "her time" with Child since Father had time with Child before Mother got home. *Id.* at 110.

[7] In 2021, Mother and Father bought a house with help from Father's grandparents. A few months later, Mother and Father separated, but continued to reside in the house together. While they were still residing in the same house, Father tried to learn Child's bath and bedtime routines. Mother had traditionally kept those times for herself: "I had my connection with [Child], and that was just our routine." *Tr. Vol. 2* at 22. Mother said she was "not letting [Father] do [bedtime] every night but . . . would attempt to let him do bedtime periodically to try to get [Child] used to it[.]" *Id.* at 23. In October, Father cared for Child by himself while Mother was gone for several days. Mother had "concerns about how [Child] was being cared for" because she did not believe she received an appropriate amount of communication from Father about Child while she was gone. *Id.* at 26.

[8] By the end of October, Mother asked Father to move out. Mother and Child remained in the marital residence and Father moved into Grandma's home approximately fifteen to twenty minutes away. He has his own room there and there is a connected but separate room for Child. After moving out, Father asked to have Child overnight, but Mother initially said no.

[9]     Mother filed a petition for dissolution in December. A magistrate presided over all the proceedings in this case. The parties appeared for a provisional hearing in March 2022 to address temporary custody and parenting time. Mother described herself as Child's primary caretaker and testified Father only became interested in spending time with Child—asking to attend her swim lessons and to take care of the bedtime routine—after the petition for dissolution was filed. Mother said she and Father agreed to a schedule for Father to see Child throughout the week and on weekends, with Mother "letting [Father] . . . come spend time with [Child] at the house," *Tr. Vol. 2* at 31, and "allowing him to have [Child] from 5 to 7 on Mondays," *id.* at 36. Mother acknowledged she denied Father's request to spend more time with Child, but explained she wanted to keep Child's life "as consistent and steady as possible," *id.* at 57, and told Father Child "needs her mom," *Tr. Vol. 4* at 116. Mother did not want Father to have overnights with Child during the week because Child "waking up [Monday through Friday] and being with me is what I believe is best." *Tr. Vol. 2* at 72. When asked, Mother said she did not intend to relocate to Utah.

[10]    Only Mother was able to testify at this hearing during the time allotted, and the hearing was continued to June. No provisional or interim order was entered in the meantime.

[11]    Mother and Child visited Utah several times while the dissolution was pending. In May, Mother filed a Notice of Intent to Relocate with Child to Utah. The Notice stated she intended to move "as soon as possible but no later than thirty (30) days from the date of this Notice" to be "near her family and friends."

*Appellee's App. Vol. 2* at 29–30. Father objected, and the trial court considered relocation at the start of the June hearing.

[12] Mother wished to relocate with Child to Utah because her support system in Indiana—Father's family—"is nothing now." *Tr. Vol. 3* at 14. To illustrate this, Mother testified that at Child's second birthday party—held jointly with both families in April—no one from Father's family other than Father himself spoke to her. She claimed communication with Grandma while Child was in Grandma's care had significantly decreased. Mother "wholeheartedly believe[d] [her] parents would always support [Father and Father's] whole family" and had expected Father's family to "support[] both of us." *Id.* at 53–54. Mother had applied for jobs in Utah but did not yet have employment there. She intended to live with her parents at first and assured the court "she would have a job by July 1st which is when she would be intending to move." *Id.* at 60. Mother also noted she would have the support of her significant other who lives in Utah. Mother suggested it would be reasonable for Father's parenting time to be a weekend visit every other month and a five-to-seven-day visit every few months. She also voiced no objection to Father moving to Utah and offered that solution as a "Proposed Parenting Time Opportunit[y]" if she relocated. *Ex. Vol. 6* at 131. The trial court denied Mother's request to relocate with Child.

[13] The parties then continued with the provisional hearing. Mother testified that since the March hearing, Father typically has Child for short periods of time three evenings a week and every other weekend from Friday evening until

Sunday afternoon. Father also had Child for an extended time in April. Mother first said no to the April vacation because she "didn't know the stipulations of where he was going, why he was going." *Tr. Vol. 3* at 84. Mother expressed concern that Child had "come home sick twice now" after being with Father, and blamed Father for Child being sick. *Id.* at 74. She also expressed concern "about who [Child] is around that she wasn't previously" when with Father and criticized him for decisions such as allowing Child to swim at a friend's house when Mother did not think the temperature was "appropriate for her to be swimming." *Id.* at 74–75. When asked on cross-examination if Father was a good dad, Mother replied, "I want [Child] to be involved with him at some level, yes." *Id.* at 94.

[14] Again, Mother was the only person able to testify in the allotted time. Before adjourning, and over Mother's objection, the trial court ordered that Father have a midweek overnight with Child in addition to the parenting time he had been exercising. Father assured the court he could adjust his work hours so he could care for Child himself in the morning or the evening rather than leaving her in Grandma's care. The provisional hearing was continued to September.

[15] In July, Mother filed a second Notice of Intent to Relocate with Child to Utah, alleging she had been offered a job there with increased pay and benefits over her Indiana employment and asserting it was in Child's best interest "to remain with the parent that has raised her." *Appellee's App. Vol. 2* at 47. Father again objected. The provisional hearing set for September was converted to a final

hearing at which all issues, including relocation, would be heard. The final hearing was held on one day in September and one day in December.

[16] Mother again testified at the now-final hearing. As to the parenting time schedule ordered by the trial court in June, Mother said Child "has continued to struggle even more . . . being apart from [Mother]." *Tr. Vol. 4* at 6–7. She claimed Child is "not safe" in Father's care because "[s]he doesn't have a routine over there." *Id.* at 9. She said Child never gets sick when she's in Mother's care; instead, Mother is "always healing her and being her safe space." *Id.* at 65. She maintained that Father has "not been a stable parent to [Child] her whole life. He's doing what he thinks is going to look good in court versus what's best for [her]." *Tr. Vol. 5* at 52.

[17] As for her intent to relocate, Mother testified she now had a "dream job" in Utah, "something that [she's] been looking for, for years, in Utah specifically." *Tr. Vol. 4* at 10. She had already started the position, working remotely, and had given notice to her Indiana employers that she would be leaving in thirty days. Explaining why it was in Child's best interest to relocate, Mother said:

> [Child] is going to thrive in that position in Utah. She has a family. She has three cousins that are right around her age that she adores. She has my parents. She has my brother and his wife. She has my grandpa. She has the support and foundation in Utah that's going to help her thrive.

*Id.* at 13. Mother denied the relationship between Father and Child would be strained if Child was living in Utah: "He can be fun Dad for his week and have

his time and do those kind of things that he's been doing with her. And then her stability and safe zone and structure would be in Utah." *Id.* at 88. On cross-examination, the following exchange occurred:

[Father's Attorney:] Who do you think is more important in [Child's] life: [Father] or your mom and dad?

[Mother:] My mom and dad.

* * *

The Court: Wait a minute. Say that again.

[Q.] I said, who do you think is more important in [Child's] life: [Father], your soon-to-be ex-husband, or your mom and dad?

[A.] My mom and dad.

Q. . . . I want to be clear. You've now testified twice that your mom and dad are more important in [Child's] life than [Father]; right?

A. That such an unfair question. I love my mom and dad more than him. . . . But it's not – I don't think one needs to be above the other.

*Id.* at 76–77.[2]

Father, for the first time in these proceedings, also testified at the final hearing. He explained his position with his employer had changed since the last hearing and his hours were flexible: "If I need to come in earlier or work later on different days to fit my home, slash, [Child's] schedule, that is available." *Id.* at 106. Since the trial court ordered a midweek overnight, Father had been going to work later on the mornings he had Child so that he could fix her breakfast and get her ready for the day.

As far as raising Child, Father said he and Mother "do a really good job together[.]" *Id.* at 116. "[I]f we were talking about what [Child is] doing or how she's feeling or going to do stuff with her, . . . we laugh, make fun of each other sometimes. The drop-offs and exchanges go very well." *Id.* at 117. But if conversation "pertain[s] to getting more time or less time with [Child]," then things get "uneasy between the two of us." *Id.* at 116–17. Father described Mother as an "[a]bsolutely" good mom. *Id.* at 118. But he believed Child's relocation to Utah would hurt his relationship with Child because he "wouldn't be able to just do little things every night [or] pick her up at school or help her with homework." *Id.* at 119. Father said he wants Child to see him as a stable father figure "that she looks up to and [can] be like, that's a good Dad." *Id.* at

---

[2] The trial court later questioned Mother about this, wanting to make sure it did not misunderstand her testimony. Mother again said she believed her parents are more important to Child than Father. *See id.* at 90.

118. He acknowledged Child needs to have a stable environment to grow up and said, "I can provide that for her." *Id.* Father asked for joint legal custody and a split parenting time schedule.

[20] Shortly after the December hearing, the trial court dissolved the parties' marriage, leaving all property and child issues to be decided on a later date. In February, the trial court entered findings of fact and conclusions thereon, again denying Mother's request to relocate Child and ordering the parties to share joint legal custody of Child with equal parenting time.

## Standard of Review

[21] At Father's request, the trial court entered findings of fact and conclusions thereon.[3] When we review judgments with findings of fact, we "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). "A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment." *In re Paternity of K.I.*, 903 N.E.2d 453, 457 (Ind. 2009). In assessing

---

[3] Mother asserts the trial court signed Father's proposed findings of fact and conclusions thereon and insinuates there are problems with the order as a result. *See Appellant's Br.* at 17 n.2. We make two observations about this assertion. First, Mother does not support her claim with citations to the record and we find nothing in the record showing the trial court adopted Father's proposed findings in whole or in part. Second, Indiana Trial Rule 52(C) allows trial courts to request that parties submit proposed findings and conclusions and the trial court is not prohibited from adopting verbatim a party's proposed order. *See In re Marriage of Nickels*, 834 N.E.2d 1091, 1095–96 (Ind. Ct. App. 2005). When a trial court does so, the court adopts the findings of fact and conclusions thereon as its own and is ultimately responsible for their correctness. *Scoleri v. Scoleri*, 766 N.E.2d 1211, 1214 n.6 (Ind. Ct. App. 2002).

whether a judgment is clearly erroneous, we do not reweigh the evidence, instead examining it in the light most favorable to the trial court's decision. *E.B.F. v. D.F.*, 93 N.E.3d 759, 762 (Ind. 2018). Clear error is "that which leaves us with a definite and firm conviction that a mistake has been made." *Masters v. Masters*, 43 N.E.3d 570, 575 (Ind. 2015) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)).

[22] Together with the standard of review under Trial Rule 52, we give considerable latitude and deference to the decisions of our trial court judges in family law matters. Trial judges have "unique, direct interactions with the parties face-to-face, often over an extended period of time," *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011), whereas we "look at a cold transcript of the record," *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016) (citation omitted). Thus, "our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children." *Best*, 941 N.E.2d at 502. We will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment. *See In re Marriage of Richardson*, 622 N.E.2d 178, 179 (Ind. 1993). "The concern for finality in custody matters reinforces this doctrine." *Baxendale v. Raich*, 878 N.E.2d 1252, 1258 (Ind. 2008).[4]

---

[4] Before addressing Mother's allegations of error, we must note our concerns about the brief and appendices filed by Mother's counsel.

## The Magistrate Had Authority to Issue the Final Order

[23]   Mother asks us to set aside the judgment because the magistrate lacked authority to enter the final order without the elected trial judge's countersignature. Mother cites Indiana Code Sections 33-23-5-8 and 33-23-5-9 in support of her position. Until June 30, 2018, Section 33-23-5-8(2) stated, "[A] magistrate . . . may not enter a final appealable order unless sitting as a judge pro tempore or a special judge." That provision of the statute was removed effective July 1, 2018. *See* Ind. P.L. 161-2018, § 47. And until June 30, 2019, Section 33-23-5-9 stated, "[A] magistrate shall report findings in an evidentiary hearing, a trial, or a jury's verdict to the court. The court shall enter the final order." That language was removed effective July 1, 2019, and

Counsel's filings fail to comply with the Appellate Rules in several respects. To mention but a few, the appendix contains the CCS, the appealed order, and exhibits that are already included in the transcript, but it contains no pleadings. *See* Ind. Appellate Rule 50(a)(2)(f), (h) (stating an appendix should include pleadings necessary for resolution of the issues and should not include record material already included in the transcript). In this particular case, at the very least Mother's two Notices of Intent to Relocate were necessary for resolution of the issues she raises. Also, the statement of the facts section of the brief—which is intended to be a vehicle for informing this Court—improperly contains self-serving statements and argument which prevented us from relying on it as an accurate representation of the proceedings. *See* App.R. 46(A)(6) (instructing that facts should be stated "in accordance with the standard of review").

But we are most troubled by the tone and content of Counsel's brief. The brief includes many instances of inappropriate editorializing and unfounded characterizations of Father and the magistrate. We caution counsel to temper his language and avoid the generally inflammatory tone of this brief in future filings with this Court. *See Clark v. Clark*, 578 N.E.2d 747, 749 (Ind. Ct. App. 1991) (noting a brief should not be used "as a vehicle for the conveyance of hatred, contempt, insult, disrespect, or professional discourtesy of any nature") (quotation omitted); *see also WorldCom Network Servs., Inc. v. Thompson*, 698 N.E.2d 1233, 1236–37 (Ind. Ct. App. 1998) ("[O]verheated rhetoric is unpersuasive and ill-advised. Righteous indignation is no substitute for a well-reasoned argument.") (footnote omitted) (opinion on reh'g). And—as will be discussed below—Counsel relies on statutory language that was amended or removed altogether at least three years before the brief was filed in support of an argument. We remind counsel of his professional responsibility to provide competent representation to his client by, in part, "keep[ing] abreast of changes in the law[.]" Ind. Professional Conduct Rule 1.1, Cmt. ¶ 6. "A brief should not only present the issues to be decided on appeal, but it should be of material assistance to the court in deciding those issues." *Young v. Butts*, 685 N.E.2d 147, 151 (Ind. Ct. App. 1997). This brief fails to meet that standard.

Section 33-23-5-9 has now been repealed in its entirety. *See* Ind. P.L. 266-2019, § 3 (amending Section 33-23-5-9); Ind. P.L. 162-2020, § 4 (repealing Section 33-23-5-9).

[24] The current law regarding the authority of magistrates is found in Section 33-23-5-8.5. Pursuant to that Section—with one limited exception not applicable here—the magistrate had "the same powers as a judge" on February 16, 2023, when the final order was issued. Ind. Code § 33-23-5-8.5 (2020). Mother's argument that the magistrate lacked authority to enter the final order lacks merit.[5]

## The Trial Court Did Not Err in Denying Child's Relocation

[25] Here, the trial court was considering relocation in the context of making an initial custody determination. In an initial custody determination, both parents are presumed equally entitled to custody, and "the court shall . . . enter a custody order in accordance with the best interests of the child." I.C. § 31-17-2-8 (2017). In determining the child's best interests, the court must consider all relevant factors, including the child's age and sex; the parents' wishes; the child's wishes; the child's relationship with parents, siblings, and any other person affecting the child's best interests; and the child's adjustment to home, school, and the community. *See id.*

---

[5] We also note that when Father asked the case to be set on the regular judge's calendar, Mother objected.

When a parent who has or is seeking custody of a child intends to relocate, the relocating parent in most circumstances must file a notice of that intention. I.C. § 31-17-2.2-1(a) (2020). Indiana Code Section 31-17-2.2-2(a) provides that when a party gives notice of relocation at an initial hearing to determine custody, "the court may consider the factors set forth in [the relocation] chapter in the court's initial custody determination."[6] The relocation factors are:

(1) The distance involved in the proposed change of residence.

(2) The hardship and expense involved for the nonrelocating individual to exercise parenting time[.]

(3) The feasibility of preserving the relationship between the nonrelocating individual and the child through suitable parenting time . . . arrangements, including consideration of the financial circumstances of the parties.

(4) Whether there is an established pattern of conduct by the relocating individual, including actions by the relocating individual to either promote or thwart a nonrelocating individual's contact with the child.

(5) The reasons provided by the:

---

[6] When a parent who already has custody of a child seeks to relocate with the child, the nonrelocating parent may file a petition to modify custody. *See* I.C. § 31-17-2.2-5(a). In determining whether to modify an existing custody order due to relocation, the "court *shall* take into account" the relocation factors. I.C. § 31-17-2.2.-1(c). In this context, "[o]ther factors affecting the best interest of the child" include the general custody factors from Section 31-17-2-8. *Baxendale*, 878 N.E.2d at 1257. But the court need not find a substantial change in any of the general custody factors in order to modify custody in that circumstance. *Id.* at 1256–57.

> > (A) relocating individual for seeking relocation; and
>
> > (B) nonrelocating parent for opposing the relocation of the child.
>
> (6) Other factors affecting the best interest of the child.

I.C. § 31-17-2.2-1(b) (2020). If the nonrelocating parent objects to the child's relocation, "[t]he relocating individual has the burden of proof that the proposed relocation is made in good faith and for a legitimate reason." I.C. § 31-17-2.2-5(a), (e) (2019). If the relocating parent shows good faith and a legitimate reason for relocating, "the burden shifts to the nonrelocating parent to show that the proposed relocation is not in the best interest of the child." I.C. § 31-17-2.2-5(f).

[27] In this case, the trial court's order shows it considered both the general custody factors and the relocation factors. The court first determined that Mother failed to establish her proposed relocation to Utah was made in good faith and for a legitimate reason. Although noting Mother's new employment in Utah is "her 'dream job' which pays more money," the trial court stated Mother has "an excellent career in Indiana" and "appears motivated to relocate to Utah because her boyfriend and extended family resides there[.]" *Appellant's App. Vol. 2* at 13. The trial court determined relocation "fails to offer any benefits to [Child] which are not already in place in Indiana." *Id.*

[28] The trial court also determined that Father established the proposed relocation was not in Child's best interest, citing these reasons: the distance involved in the

move was significant; there would be significant expense and hardship to Father to exercise parenting time; and Father would miss out on Child's daily activities and "bonding time together." *Id.* at 14. The trial court also found:

> 91. . . . Mother's testimony that she considered her parents' relationship with [Child] more important than [Child's] relationship with her father reflects that Mother would and/or has attempted to thwart [Child's] relationship with Father.
>
> 92. There was also evidence that . . . there have been times that Mother has not encouraged a relationship between Father and [Child].

*Id.*

[29] Ultimately, the trial court denied Mother's request to relocate to Utah with Child and determined Mother and Father should share physical custody of Child, exercising equal parenting time with her. On appeal, Mother does not challenge the trial court's physical custody decision; she challenges only the trial court's findings that she failed to prove good faith and a legitimate reason for relocation and that relocation was not in Child's best interests.

[30] There are no explicit criteria for determining whether a relocation request is made in good faith and for a legitimate reason. *Gold v. Weather*, 14 N.E.3d 836, 842 (Ind. Ct. App. 2014), *trans. denied*. This Court has generally required the relocating parent to show an objective reason that is "more than a mere pretext" for relocating. *T.L. v. J.L.*, 950 N.E.2d 779, 787 (Ind. Ct. App. 2011).

> [I]t is common in our society that people move to live near family members, for financial reasons, or to obtain or maintain employment. We infer that these and similar reasons . . . are what the legislature intended in requiring that relocation be for "legitimate" and "good faith" reasons.

*Id*. at 787–88. Unless the stated reasons for relocation "are solely pretextual (or illegitimate on their face), a rather low bar in application," *Lynn v. Freeman*, 157 N.E.3d 17, 25 (Ind. Ct. App. 2020), the resolution of a relocation request should ultimately turn on a judicial determination of the best interests of the child involved, *T.L.*, 950 N.E.2d at 788.

[31] In light of the trial court's findings that Mother's proposed relocation was to live closer to her family and significant other and for a better employment opportunity, the trial court erred in concluding Mother's proposed relocation was not made in good faith and for a legitimate reason.[7] Mother's reasons for relocating are not solely pretextual and reflect the common realities of life previously acknowledged by this Court. But our inquiry does not end there, because the trial court also concluded relocation was not in Child's best interests.

---

[7] Mother's brief emphatically and repeatedly claims one of her reasons for relocating is "for the purposes of avoiding domestic abuse[.]" *Appellant's Br.* at 20. Although Mother testified to an incident she perceived as Father "tracking" her via the Find My Friends app on her phone and an instance of Father "cussing [her] out," *Tr. Vol. 2* at 27; *Tr. Vol. 5* at 60, domestic abuse was not advanced as a reason for Mother's move before the trial court. In addressing the general custody factors, the trial court found there was no evidence of domestic violence between these parties. *See Appellant's App. Vol. 2* at 19 (citing I.C. § 31-17-2-8(7)). We will not reweigh the evidence and further, we note this claim on appeal is at odds with Mother's proposal at trial that Father could also move to Utah.

[32] The trial court received evidence on several of the relocation factors. No specific evidence was offered about the distance between Central Indiana and Salt Lake City, Utah, or about the time and cost of travel between the two locations. But it is uncontested that Utah is very far from Father's home in Central Indiana and short, frequent trips between the two states for parenting time would likely not be feasible, financially or otherwise. At the time of the final hearing, Father was exercising parenting time with Child every other weekend and several evenings each week, including an overnight. Mother's relocation to Utah with Child would substantially curtail the amount and regularity of Father's visitation with Child and negatively impact the relationship between the two. In addition, Child has been cared for by Grandma several days a week for most of her life. A move would also impact their relationship, as well as Child's relationships with Father's extended family who live nearby.

[33] Aside from the complexities that arise from physical distance in any case, the trial court identified Mother's attitude about the relationship between Father and Child as a cause for concern. Throughout this case, Mother has revealed a sense of entitlement to dictate how and when Father and Child interact. Mother assumed the role of primary custodian and acted as the gatekeeper for Father's parenting time without any legal basis, as no provisional order

regarding custody and parenting time was ever entered.[8]  Mother's actions and testimony show at best a reluctance to acknowledge Father is also Child's parent and equally able and entitled to make decisions for her, even if they are not the decisions Mother would make.  And as the trial court pointed out, Mother testified *four* times that she believed Child's relationship with maternal grandparents was more important than Child's relationship with Father.  Mother's cavalier attitude about preserving Father and Child's relationship warrants the trial court's concern about whether Mother would encourage and facilitate a relationship between the two if Mother were to relocate with Child to Utah.  *See, e.g.*, *Tr. Vol. 3* at 94 (Mother stating she wants Child to be involved with Father "at some level"); *Tr. Vol. 4* at 88 (Mother testifying Father "can be fun Dad for his week" but Child should live with her in Utah).

[34]    Affording the trial court the considerable deference due in family law matters, we cannot say the trial court clearly erred in denying Mother's request to

---

[8] To the extent Mother and her counsel implicitly relied on Child's sex and young age as a basis for Mother to assume the lead role as custodian and decision-maker for Child and then used that assumption to argue Child should "remain with the parent that has raised her," *Appellee's App. Vol. 2* at 47, Father correctly points out that the "Tender Years Doctrine" (also known as the Maternal Preference Rule) is "an outdated principle." *Appellee's Br.* at 24.  The purpose of the statute declaring there is no presumption in favor of either parent when making an initial custody determination is, in part, "to overcome . . . the maternal preference rule followed in many [older] cases wherein the mother [was] given preference particularly as to custody of children of tender years or female children." *D.H. v. J.H.*, 418 N.E.2d 286, 290 (Ind. Ct. App. 1981).

relocate with Child. The trial court's best interest determination was well supported by the court's findings and the evidence presented below.[9]

## The Trial Court Did Not Err by Ordering Joint Legal Custody

[35] Mother also challenges the trial court's decision that she and Father should share joint legal custody of Child. The trial court found that Mother and Father "are able to effectively communicate except close in time to hearing dates" and determined joint custody would be in Child's best interests. *Appellant's App. Vol. 2* at 20.

[36] In determining whether an award of joint legal custody is in the best interest of the child, "the court shall consider it a matter of primary, but not determinative, importance that the persons awarded joint custody have agreed to an award of joint legal custody." I.C. § 31-17-2-15 (2008). The court also considers:

> (1) the fitness and suitability of each of the persons awarded joint custody;

---

[9] Mother contends the trial court did not allocate the burden of proof appropriately, requiring Mother to prove relocating was in Child's best interests rather than requiring Father to prove relocating was *not* in her best interests. *See Appellant's Br.* at 20. The trial court did ask Mother during the provisional hearing related to her first notice of intent to move how moving would serve Child's best interests. But Father did not get to testify in these proceedings until more than halfway through the *next* hearing, after Mother had filed a second notice of intent to relocate, the denial of which is on appeal now. Once Father took the stand, he did offer reasons why relocating would not be in Child's best interests; namely, she would not have the benefit of a close, hands-on relationship with *both* parents. And, importantly, the trial court specifically found that Father had "rebutted any inference that the relocation was in [Child's] best interests," showing the court applied the correct standard. *Appellant's App. Vol. 2* at 28.

(2) whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;

(3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;

(4) whether the child has established a close and beneficial relationship with both of the persons awarded joint custody;

(5) whether the persons awarded joint custody:

    (A) live in close proximity to each other; and

    (B) plan to continue to do so; and

(6) the nature of the physical and emotional environment in the home of each of the persons awarded joint custody.

*Id.*

[37] Joint legal custody means "that the persons awarded joint custody will share authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training." I.C. § 31-9-2-67 (2009). Thus, the willingness and ability to communicate and cooperate in advancing the child's welfare "is of particular importance in making legal custody determinations." *Milcherska v. Hoerstman*, 56 N.E.3d 634, 641 (Ind. Ct. App. 2016). That is, the trial court decides "whether the parents have the ability to work together for the best interests of their children." *Arms v.*

*Arms*, 803 N.E.2d 1201, 1210 (Ind. Ct. App. 2004). "[I]f the parties have made child-rearing a battleground, then joint custody is not appropriate." *Periquet-Febres v. Febres*, 659 N.E.2d 602, 605 (Ind. Ct. App. 1995), *trans. denied*.

[38] Mother's argument that joint legal custody is inappropriate rests almost entirely on her assertion that she is the victim of domestic violence. As noted above, *supra* n.7, the trial court found no evidence of domestic violence and we will not reweigh the evidence to conclude otherwise. The parties did not agree to joint custody—Father requested joint custody; Mother testified that she wants to be the one to make decisions for Child. *See Tr. Vol. 3* at 84. But Father testified he and Mother "do a really good job together" of parenting Child. *Tr. Vol. 5* at 116. Their primary source of contention in the absence of a court order was parenting time, and the trial court's final order has settled that issue. There was no evidence child-rearing was a "battleground." The trial court's order shows it analyzed each factor relevant to a joint custody determination and determined joint legal custody was appropriate and in Child's best interests. Evidence in the record supports the court's findings. Considering the substantial discretion afforded to trial courts in custody determinations, we cannot say the trial court's decision to award joint legal custody was clearly erroneous.

## Conclusion

[39] The magistrate had authority to enter a final order here and did not clearly err in denying Mother's request to relocate Child to Utah or in awarding the parties joint custody. The judgment of the trial court is affirmed.

Affirmed.

Altice, C.J., and Weissmann, J., concur.